ESTATE OF HARRY STOLL LEYMAN, DECEASED, HARRY S. LEYMAN, JR., EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 77075.    Filed April 24, 1963

*William R. Seaman, R. O. Klausmeyer,* and *Sherman E. Unger,* for the petitioner.

*Charles R. Hembree,* for the respondent.

SCOTT, *Judge:* Respondent determined a deficiency in estate tax and addition to tax under section 3612(d)(2) of the Internal Revenue Code of 1939 in the amounts of $1,804,228.98 and $1,930,350.45, respectively.

The issues for decision are:

(1) What was the fair market value of 2,309 shares of Leyman Corp. common stock on May 24, 1954, the date of death of Harry Stoll Leyman.

(2) Whether Harry S. Leyman, Jr., as executor of the estate of Harry Stoll Leyman, deceased, willfully filed a false and fraudulent estate tax return on behalf of the estate.

(3) If a false and fraudulent estate tax return was filed by the executor, is the amount to be added to the tax because of the filing of such a false and fraudulent return governed by the provisions of section 6653(b) of the Internal Revenue Code of 1954 or the provisions of sections 871(i), 894(a), and 3612(d)(2) of the Internal Revenue Code of 1939.

(4) If the executor filed a false and fraudulent estate tax return and the addition to tax for such filing is governed by the provisions of sections 871(i), 894(a), and 3612(d)(2) of the Internal Revenue Code of 1939, is the amount computed under the provisions of these sections 50 percent of the deficiency or 50 percent of the entire correct amount of the estate tax due.

#### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Harry Stoll Leyman (hereinafter referred to as decedent) died on May 24, 1954. Harry S. Leyman, Jr. (hereinafter sometimes referred to as the executor), is the executor of decedent's estate. The Federal estate tax return for decedent's estate was filed on July 21, 1955, with the district director of internal revenue at Cincinnati, Ohio, and the tax of $2,046,158.28 shown thereon to be due was paid on that date. As the result of a mathematical error on the return, an additional tax of $10,313.63 was paid by the estate on August 18, 1955.

At the date of his death, decedent owned 2,309 shares of the common capital stock of Leyman Corp., an Ohio corporation, out of a total of 9,400 common shares and 4,300 preferred shares issued and outstanding. The preferred shares had a par value of $100 and a redemption price of $110 per share and provided for cumulative dividends at the rate of 7 percent per annum. The common capital stock of Leyman Corp., other than that owned by decedent's estate, and

the preferred shares which were outstanding on May 24, 1954, were owned as follows:

| Stockholders | Relationship to decedent | Number of shares | |
|---|---|---|---|
| | | Preferred stock 7 percent | Common stock |
| H. S. Leyman, Jr. | Son | 789 | 1,178 |
| Grace L. Lull (trust) | Daughter | 789 | 1,178 |
| Elizabeth L. von Weise (trust) | do | 789 | 1,178 |
| Susannah L. Atterbury (trust) | do | 789 | 1,178 |
| H. S. Leyman, Jr. (trust) | Son | 286 | 594¾ |
| Grace L. Lull (trust) | Daughter | 286 | 594¾ |
| Elizabeth L. von Weise (trust) | do | 286 | 594¾ |
| Susannah L. Atterbury (trust) | do | 286 | 594¾ |

The officers of Leyman Corp., prior to May 24, 1954, were Harry Stoll Leyman, president; Harry S. Leyman, Jr., vice president, secretary, and assistant treasurer; and J. O. Miller, treasurer and assistant secretary. After the death of Harry Stoll Leyman the other officers remained unchanged until October 6, 1954, at which time the following officers were elected: Harry S. Leyman, Jr., president; J. O. Miller, vice president and treasurer; and E. Riemenschneider, secretary. No further change in the officers of the corporation occurred until after 1958.

Leyman Corp., in the form in which it existed on May 24, 1954, was the result of the mergers into it in 1936 of the Leyman Buick Co., the Dayton Buick Co., Walnut-Seventh Realty Corp., and Midland Securities Corp.

During the years immediately preceding decedent's death, Leyman Corp. operated a Buick agency at Dayton, Ohio; owned, invested, and reinvested a portfolio of listed securities; owned and operated various real estate holdings in Dayton and Cincinnati, Ohio, and Miami Beach, Fla.; and owned residential property in Harbor Point, Mich. During these years Leyman Corp. operated a Buick agency in Louisville, Ky., through a subsidiary company, Leyman Motor Co., Inc.; a parking garage in Cincinnati through a subsidiary company, Eastbourne Garage, Inc.; and a parking lot in Cincinnati through a subsidiary company, Central Parkway and Walnut, Inc.

Shortly after decedent's death the Buick agency franchises at Dayton, Ohio, and Louisville, Ky., which were terminable upon his death, were terminated in accordance with their terms by the Buick Motor Division of General Motors Corp.

The following schedule shows the income and expenses of Leyman Corp. for each of the years 1949 through 1956.

| | 1949 | 1950 | 1951 | 1952 | 1953 | 1954 | 1955 | 1956 |
|---|---|---|---|---|---|---|---|---|
| **Income:** | | | | | | | | |
| Interest | $13,393.63 | $10,833.21 | $10,987.30 | $12,634.36 | $13,402.02 | $12,953.92 | $11,927.27 | 207,572.25 |
| Dividends | 184,741.43 | 213,366.24 | 196,155.06 | 189,835.39 | 183,069.40 | 154,549.65 | 168,900.39 | 341,557.52 |
| Rents | 286,038.41 | 312,034.09 | 314,839.67 | 325,341.30 | 341,674.30 | 372,794.12 | 345,578.89 | 132,705.51 |
| Sales, stocks and bonds | (72.12) | 99,497.34 | 37,121.96 | 1,117.91 | 1,181.62 | 42,964.79 | 9,262.24 | |
| Sales, capital assets | 63.32 | 790.06 | 42.16 | 1,676.75 | 917.89 | (62,758.96) | 144,538.41 | |
| Sales—GMAC notes | | 6,215.97 | 20,461.12 | 17,184.03 | 23,658.34 | 19,551.39 | 270.00 | |
| Settlement—Race St. case | | | 200,000.00 | | | | | |
| Recovery bad debt | | | | | | | 31.86 | |
| Total income | 484,164.67 | 642,736.91 | 779,607.27 | 547,789.74 | 563,903.57 | 540,054.91 | 680,499.06 | 681,835.28 |
| Total expenses and deductions (including depreciation) | 203,136.30 | 218,918.55 | 256,742.26 | 241,429.87 | 332,470.30 | 236,813.22 | 280,980.60 | 462,090.01 |
| **Net profit:** | | | | | | | | |
| Cincinnati | 281,028.37 | 423,818.36 | 522,865.01 | 306,359.87 | 231,433.27 | 303,241.69 | 399,508.46 | |
| Dayton Buick Division | 325,689.65 | 248,997.39 | 160,765.68 | 103,435.43 | 119,198.57 | 11,085.18 | | |
| Oil operation loss | | | | | | | (138,501.70) | (341,154.78) |
| Nebel Machine Tool loss | | | | | | | (7,982.14) | (38,113.75) |
| Net profit before Federal income taxes | 606,718.02 | 672,815.75 | 683,680.69 | 409,795.30 | 350,631.84 | 314,326.87 | 253,084.62 | (159,523.26) |

The following schedule shows the assets and liabilities of Leyman Corp. as of December 31, for each of the years 1949 through 1956, the market value of the securities owned by Leyman Corp. for each of these dates, and the amount of dividends paid on the common stock for each of the years 1949 through 1956.

| | 1949 | 1950 | 1951 | 1952 | 1953 | 1954 | 1955 | 1956 |
|---|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | | |
| Cash on hand | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $50.00 | $100.00 |
| Cash—bank | 31,992.84 | 230,125.87 | 195,481.02 | 536.89 | 28,036.53 | 118,257.74 | 120,841.98 | 128,718.55 |
| Notes | 199,500.00 | 193,000.00 | 260,350.00 | 230,550.00 | 210,750.00 | 325,602.00 | 456,895.00 | 1,243,717.40 |
| Securities at cost | 2,554,927.62 | 2,458,408.50 | 2,734,832.60 | 2,932,868.21 | 2,739,544.64 | 2,155,392.46 | 2,107,634.88 | 1,686,005.61 |
| Cash surrender value insurance | 442,059.30 | 454,589.60 | 469,119.90 | 482,436.20 | 497,092.50 | | | |
| Real estate at cost less depreciation | 2,757,441.62 | 2,974,993.80 | 3,053,295.48 | 3,241,935.24 | 3,577,945.02 | 4,122,327.75 | 3,801,930.03 | 3,821,991.24 |
| Dayton Buick Division | 275,689.65 | 298,997.39 | 360,765.68 | 303,435.43 | 399,198.57 | | | |
| Miscellaneous | 3,619.60 | 4,826.54 | 5,102.48 | 3,209.72 | 8,068.96 | 30,785.08 | 7,061.13 | 110,065.41 |
| Accounts receivable | | | | | | 5,845.04 | 1,523.47 | 6,171.59 |
| Nebel machine tool division | | | | | | | 348,279.86 | 744,425.15 |
| Oil ventures | | | | | | 31,900.00 | 110,244.26 | 380,161.12 |
| **Liabilities:** | | | | | | | | |
| Total current liabilities | 634,468.08 | 635,157.53 | 787,879.95 | 764,424.27 | 1,191,985.21 | 915,853.08 | 891,341.13 | 1,663,046.73 |
| Reserves, capital stock and surplus | 5,630,812.55 | 5,979,834.17 | 6,281,117.21 | 6,430,597.42 | 6,288,701.01 | 5,874,301.99 | 6,083,119.48 | 6,458,309.34 |
| Securities at market value | 3,038,444.38 | 3,080,051.15 | 3,767,378.66 | 4,260,866.98 | 4,130,255.08 | 4,640,345.26 | 4,925,495.29 | 4,739,821.76 |
| Common stock dividend paid for year | 116,500.00 | 112,800.00 | 112,800.00 | 112,800.00 | 112,800.00 | 112,800.00 | 56,400.00 | 56,400.00 |

The balance sheet of Leyman Corp. as of May 31, 1954, shows the following:

### Current assets

| | | |
|---|---:|---:|
| Cash | | $54,096 |
| Notes receivable | | 202,500 |
| Investments (at cost) | | 1,909,021 |
| Face value life insurance | | 660,000 |
| Total current assets | | 2,825,617 |
| Automobiles—cost | $7,864 | |
| Less reserve for depreciation | 1,902 | |
| Automobiles net | | 5,962 |
| Real estate—cost | 4,850,210 | |
| Less reserve for depreciation | 810,670 | |
| Real estate net | | 4,039,540 |
| Furniture and fixtures—cost | 2,714 | |
| Less reserve for depreciation | 1,719 | |
| Furniture and fixtures net | | 995 |
| Dayton Buick Division—net assets | | 402,199 |
| Total assets | | 7,274,313 |

### Current liabilities

| | |
|---|---:|
| Notes payable | 0 |
| Accounts payable—Leyman Motor Co | 475,000 |
| Accounts payable—other | 122,741 |
| Accrued local taxes | 61,453 |
| Accrued old age benefits and withholding taxes | 218 |
| Accrued Federal income tax | 55,671 |
| Total current liabilities | 715,083 |
| Reserves | 3,150,000 |
| Preferred stock | 430,000 |
| Common stock | 940,000 |
| Surplus | 2,039,230 |
| Total liabilities and capital | 7,274,313 |

The corporation's real estate holdings as of May 24, 1954, were made up of 41 business properties, 4 in Dayton, Ohio, and the remainder in downtown Cincinnati, Ohio, and 3 residential properties, 1 of which was located in Harbor Point, Mich., and 2 of which were located in Miami Beach, Fla. The real estate had a net book value of $3,939,540 and a fair market value as of May 24, 1954, of $4,680,442. At least 30 percent of the real estate was unimproved and was being used as parking lots, used car lots, or for service stations, any improvements on the land being used for such service stations not having been built by Leyman Corp. Other properties were improved with buildings which

were being used for light manufacturing, stores, shops, bowling alleys, rooming houses, a family-type hotel, and a U.S. Post Office station. Some of the buildings were old, having been built around 1900 but were in a fair state of repair. On the basis of the 1954 Ohio tax allocation between land and improvements, the total fair market value of the business properties of $4,571,008 as of May 24, 1954, was comprised of land values of approximately $3,766,875 and improvement values of approximately $804,133.

The major portion of the securities held by Leyman Corp. throughout the period 1949 through 1956 was stocks which were listed on recognized exchanges. The listed stock held by Leyman Corp. as of May 24, 1954, had a total cost of $1,621,207.03 and a total fair market value of $3,400,703.52. Included in these securities were 32,870 shares of stock of the First National Bank of Cincinnati which had a total cost to Leyman Corp. of $686,498.80 and a fair market value of $1,257,277.50. In addition to these listed stocks, Leyman Corp. on May 24, 1954, held $100,000 face value of U.S. Government F bonds with a cost of $74,000 and a fair market value of $83,500 and all of the stock of Central Parkway & Walnut, Inc. (100 common shares), Eastbourne Garage, Inc. (250 common shares), and Leyman Motor Co. (500 common shares). The book value of these corporations as of December 31, 1953, and earnings for the year 1953 were:

|  | Book value Dec. 31, 1953 | Earnings 1953 |
| --- | --- | --- |
| Central Parkway & Walnut, Inc. | $1,484 | $1,732 |
| Eastbourne Garage, Inc. | 105,569 | 12,550 |
| Leyman Motor Co. | 836,596 | 71,494 |

Leyman Corp. owned life insurance on decedent's life which had a cash surrender value on December 31, 1953, of $497,092.50, which insurance on decedent's death on May 24, 1954, was worth the full face value of the policies or $660,000.

In the latter part of 1953 and early part of 1954 Leyman Corp. sold $830,000 of General Motor Acceptance Corp. notes and expended $310,364.86 in payment of an additional assessment of Federal income taxes for the years 1947 through 1950 as surtax for improper accumulation of surplus and $76,216 for interest thereon, and also expended $200,000 on April 20, 1954, $100,000 on each May 10 and May 29, 1954, and $190,000 on December 20, 1954, as payments to the board of trustees of the Public Library of Cincinnati and Hamilton County in accordance with an agreement entered into between Leyman Corp. and the board of trustees of the Public Library on October 22, 1951, whereby Leyman Corp. agreed to purchase, and the board of trustees of the Public Library to sell, the premises known as 623–631 Vine

Street, Cincinnati, Ohio, and in accordance with which agreement petitioner had paid $25,000 to the board of trustees of the Public Library on March 22, 1951. The agreement of purchase and sale was supplemented by a further agreement dated November 22, 1954.

In 1951 Leyman Corp. received $200,000 of nonrecurring income in settlement of litigation involving its Race Street property.

The stock of Leyman Corp. was not listed on any exchange or with any broker.

Leyman Corp. is not a regulated investment company.

At the time of his death decedent was 81 years old. He had not been well for approximately 10 years prior to his death and for several years prior thereto had nurses caring for him. During the last 2 years of his life decedent was very weak. He was hospitalized in the fall of 1953 for a period of approximately 4 weeks and after leaving the hospital had nurses with him 24 hours a day until his death.

Even though in ill health decedent came regularly to the Leyman Corp.'s office when not on vacations until the latter part of 1952 or early part of 1953 and actively directed the affairs of Leyman Corp. During the early part of 1953 when decedent ceased coming regularly to the corporation's office and during the last several months preceding his death when he did not come to the office at all, he still kept in touch with the affairs of the corporation by consulting with the corporate officers and employees in his home.

Under decedent's will which was executed in 1944 with a codicil executed on January 12, 1946, Harry S. Leyman, Jr., was named executor in the event that decedent survived his wife. Harry S. Leyman, Jr., was decedent's only son. Decedent's wife died in 1947. In addition to his son, decedent was survived by three daughters.

Decedent's will provided for payments of debts and disposition of tangible personal property (not including money, stocks, bonds, or investments), and specific bequests of $35,000, and that the remainder of his property of whatever kind be divided into four equal shares, one share to be delivered to the trustees for each of four trusts, one for each of decedent's daughters, and one for his son, Harry S. Leyman, Jr.

The will appointed decedent's wife, his son, Harry S. Leyman, Jr., and J. O. Miller as trustees of each of the four trusts and provided that if his wife predeceased him or otherwise did not qualify or ceased to be a trustee, that his son, Harry S. Leyman, Jr., should nominate a person to become trustee in place of decedent's wife.

The will further provided for the trustees in the event that both decedent's wife and son had for any reason ceased to act as trustee, and that decedent's wife should have the power to remove any person as a trustee other than his son, and that if the death of his wife occurred prior to decedent's death, his son, Harry S. Leyman, Jr., dur-

ing his lifetime, should have the power to remove any person at any time acting as trustee and to nominate a person to replace the person so removed.

In 1953 the executor was authorized to sign checks on decedent's personal bank account, and thereafter, the executor paid the personal bills and expenses for decedent. The executor also regularly visited decedent in his home at least twice a week after decedent became inactive.

At the time of the trial in this case the executor was 48 years old, married, and had four children. He was graduated from Yale University in 1936, receiving a bachelor of science degree in applied economics. After graduation from Yale University he worked for the First National Bank of Cincinnati for approximately 4 years, at first in the investment or bond department, next in the credit department, and finally in the new business development department.

After leaving the First National Bank in Cincinnati, the executor organized the Leyman Manufacturing Co. which manufactures pumps, machine tool parts, and engines. He became president and active manager of the corporation upon its organization, which position he continued to hold at the time of the trial of this case.

In 1936 the executor became vice president, secretary, assistant treasurer, and a director of Leyman Corp. and continued to hold these offices from that time until 1954 when he became president of the corporation. In either December 1952 or February 1953 the executor succeeded decedent as a director of the First National Bank of Cincinnati.

Although until the time of decedent's death the executor devoted most of his time to the Leyman Manufacturing Co., he did participate in directors meetings of the Leyman Corp., represented decedent at Buick automobile sales meetings, and performed other functions for Leyman Corp. when requested to do so by decedent or J. O. Miller (hereinafter referred to as Miller), the treasurer and assistant secretary of Leyman Corp.

Miller had been employed by decedent for many years prior to 1936 and by Leyman Corp. after 1936. Miller as treasurer of Leyman Corp. maintained some stock records and handled financial statements supplied by the managers of the Buick agencies but none of the major decisions on behalf of the corporation was made by him.

E. Riemenschneider was decedent's private secretary at the date of his death and for many years prior thereto. She had been employed by decedent or Leyman Corp. from sometime prior to 1930. After decedent's death she became the executor's private secretary as well as the secretary of Leyman Corp.

At the date of his death decedent owned currency in the amount of $613,314.52 which was not reported on the estate tax return. This currency was located in safe-deposit box No. 492 rented by the Ley-

man Corp. from the First National Bank in Cincinnati. Safe-deposit box No. 492 was a large combination lockbox and behind the one door there were five separate drawers or containers, one of which was filled or substantially filled with currency on the date of decedent's death and prior thereto. The executor had known of the existence of currency in safe-deposit box No. 492 for at least 10 years prior to decedent's death. In late 1943 or early 1944 the executor had been searching for a stock certificate of Leyman Corp. which had been misplaced and had opened the box containing the currency and seen the currency located therein at that time.

The only persons ever authorized to enter Leyman Corp.'s safe-deposit box No. 492 were decedent and the executor, and after decedent's death the executor was the only person authorized to enter this box.

The records of the First National Bank in Cincinnati show entries by the executor to safe-deposit box No. 492 on a number of occasions during the period from December 1, 1948, to the end of 1951. These records show entries on 31 occasions during the year 1952, on 66 occasions during the period from January 1, 1953, to May 24, 1954, and on 50 occasions from May 24, 1954, to July 21, 1955. The last entry shown by the records of the First National Bank by decedent to box No. 492 was on October 27, 1952.

On a number of occasions decedent and executor visited safe-deposit box No. 492 together but only one of them signed for entry. Usually, on the occasions when they visited the box together, the executor would sign with the bank for entry and his initials only would be shown on the bank's records of calls on those occasions. On occasions when the decedent and the executor entered the box together, the executor would carry containers from box No. 492 to a table or dividend room at the decedent's request, but he had no knowledge of what decedent did with the contents of the containers which he carried to him. The executor never carried the container containing the currency to a table or dividend room for decedent. The decedent did not accompany the executor to box No. 492 after the fall of 1953.

At the date of decedent's death safe-deposit box No. 492 contained some jewelry which belonged to decedent. The jewelry was located either in the drawer or container with the currency or the one next to it. The jewelry was reported on the estate tax return at a value of $28,500 on the basis of information supplied by the executor to the attorney who prepared the return.

At the time of his death decedent owned municipal bonds having a value of approximately $1 million which were reported on his estate tax return. At the time of decedent's death the bonds which were reported on the estate tax return were located at decedent's residence,

and a few days after decedent's death the executor took these bonds from decedent's residence to the First National Bank in Cincinnati and as executor for the estate entered into an agreement with the bank making the bank custodian of the bonds. The auditor's reports of Leyman Corp. for the years 1949 through 1956 show no municipal bonds owned by Leyman Corp. For the years 1949 through 1956 the annual audit of Leyman Corp. included a physical verification of the securities owned by that corporation which verification was made by the auditor in each of these years in the executor's presence. The executor was aware of the fact that in 1951 bonds which prior thereto had been kept in safe-deposit box No. 492 were taken by decedent to his home, and thereafter kept in a locked closet at decedent's residence.

In December 1953 decedent took some bonds from a locked closet in his room at his residence, handed them to the executor, and requested the executor to sell the bonds, to replace the bonds with other bonds, if possible, and to take the difference in the amount he received for the bonds sold and the amount paid for the bonds purchased in cash. In accordance with this direction, the executor requested a broker to sell the bonds and to replace them with bonds, the purchase of which had been the subject of discussion between the broker and the executor, and to give the executor the difference in currency. The broker investigated the best method of selling the bonds, did sell the bonds, and the accounts were put through in a name selected by the broker and not in the Leyman name. After sale of the bonds, other bonds were purchased in an amount of approximately $40,000 and the broker gave the executor approximately $80,000 in currency which was the difference between the selling price of the bonds sold and the purchase price of the bonds purchased. The executor took the newly purchased bonds to decedent at decedent's residence and at decedent's direction placed the currency in the amount of approximately $80,000 which he had received from the bonds sold in safe-deposit box No. 492. At the time the executor placed the $80,000 in the container in safe-deposit box No. 492 which held the currency, he noticed that the container was almost filled with currency and that there were from 9 to 11 different bundles of currency in the container.

During the period from the beginning of 1950 to May 24, 1954, there were 24 meetings of the board of directors of the Leyman Corp. all of which were attended by the executor who acted as secretary. After May 24, 1954, the executor presided as chairman at all meetings of the board of directors. In January 1953 the executor as an officer of the Leyman Corp. was studying plans and estimates relating to the erection of prefabricated steel garages with estimated costs of from $600,000 to $800,000.

In September 1953 Leyman Corp. borrowed $200,000 from the First National Bank in Cincinnati which it used to pay tax assess-

ments for prior years, and in October 1953 the corporation borrowed $400,000 from the same bank which it used to buy real estate and for ordinary business expenses and working capital. The notes given for these loans were signed by decedent as president of Leyman Corp.

After the death of decedent and prior to the filing of the estate tax return, the executor as president of Leyman Corp. became the active manager of the corporation. He caused the corporation to borrow from the estate $150,000 on December 23, 1954, $200,000 on April 18, 1955, and $100,000 on April 29, 1955. The $150,000 loan was repaid on February 8, 1955, and the $100,000 loan was repaid on May 11, 1955. The $200,000 loan was used by the corporation to purchase the Nebel Machine Tool Co. At the time these loans were made the executor checked with the secretary of the corporation as to the corporation's cash balance and determined that the corporation needed to borrow the money.

During the period from May 24, 1954, throughout the balance of that year the executor had available to him the financial statements of the corporation and studied these statements and did not see the currency which was located in safe-deposit box No. 492 listed on these statements. The currency located in this box was not listed on the books or the financial statement of the Leyman Corp. prior to or in 1954 or 1955.

The estate tax return for decedent's estate was prepared by an attorney for the estate under the executor's direction and most of the information contained therein was supplied by the executor from his personal knowledge and from the records in the office of Leyman Corp. The estate tax return was signed by the executor. In Schedule C of the estate tax return, cash in the amount of $219,781.40 was reported as being owned by decedent at the time of his death, consisting of balance in commercial account in the First National Bank of Cincinnati in the amount of $218,668.53, balance in commercial account in the Miami Beach bank in the amount of $1,000, and currency in decedent's possession in the amount of $112.87. The figure as to the currency in decedent's possession at the date of his death was supplied by the executor to the attorney who prepared the return.

The executor did not disclose to anyone the existence of the currency in safe-deposit box No. 492 until shortly after April 18, 1958, when he disclosed the existence of this currency to Ike Lanier, an attorney, who as a member of an accounting firm had, for a number of years, made audits of Leyman Corp. and represented decedent and Leyman Corp. in tax matters and was representing the executor in connection with the estate tax investigation.

In the early part of 1958 Earl S. Schoenecker, an internal revenue agent assigned to examine estate tax returns, began an examination

and field investigation with respect to the estate tax return filed by the executor on behalf of decedent's estate. On February 18, 1958, in the early stages of his investigation, the examining agent, while working in the offices of Leyman Corp. with Ike Lanier (hereinafter referred to as Lanier), was introduced to and talked briefly with the executor. The examining agent, as a part of his investigation which included the verification of the municipal bonds owned by decedent at the time of his death, asked Lanier to supply him with the names of brokers from whom decedent had purchased the municipal bonds listed as assets of the estate on the estate tax return. Lanier gave the agent the names of several brokers in Cincinnati. The agent inquired of these brokers and found that decedent had purchased a few bonds from them in the early 1930's. The agent inquired further from Lanier but received no further information concerning where the bonds might have been purchased.

Subsequently, the agent was informed by a municipal bond broker that he believed one of the bonds listed on the return by the estate was part of an issue handled by only three brokers in Cincinnati. Upon investigation the agent was informed by one of the brokers to whom he was directed as handling this issue of municipal bonds that the particular bond listed on the estate tax return was sold to Thomas Smith. The agent examined the account of Thomas Smith with the broker and ascertained that approximately $200,000 of bonds which had been reported on the estate tax return had been purchased through the Thomas Smith account with this broker, and that all of these purchases had been with currency.

After receiving this information from the broker, the examining agent through Lanier requested a conference with the executor and such a conference was arranged and held on April 18, 1958, with the examining agent, Lanier, and the executor in attendance. The examining agent stated the information he had received with regard to the Thomas Smith account and asked for information relating to the names of any other brokers from whom the decedent had purchased bonds. The executor stated that the only additional broker of whom he knew was one in Miami, Fla., and gave the examining agent that broker's name and volunteered to, and did, write to the Miami broker and furnished the agent with a copy of the broker's reply. The agent requested the executor to investigate further the decedent's bond transactions, and the executor suggested that the examining agent use his investigative authority to find the other accounts.

Further investigation by the examining agent and a special intelligence agent led to their determination that the majority of the bonds reported on the estate tax return were purchased through about 8 different brokers in about 22 names.

At the conference on April 18, 1958, the examining agent stated to the executor and Lanier that the bonds purchased through the Thomas Smith account had been paid for with currency and inquired as to the source of the currency used for decedent's purchase of these bonds. The executor stated that he did not know the source but also stated, and this statement was confirmed by decedent's former secretary, that decedent had not deposited all of his dividend checks so that these might have been a source of funds. The examining agent advised the executor that he would investigate the source of funds used for the purchase of the bonds and requested and obtained from the executor the decedent's bank records and his retained copies of income tax returns from 1917 to the date of decedent's death, which documents the examining agent began to examine on the afternoon of April 18, 1958.

An intelligence division agent was thereafter assigned to assist the examining agent and later they made an extensive examination of decedent's records and income tax returns but no adjustments of decedent's returns have been proposed as a result of this investigation. Throughout the examination of decedent's income tax returns and the various items of the estate tax return, any records requested by the agents were furnished to them and the executor generally cooperated with the agents.

On April 28, 1958, Lanier called the examining agent and asked for a conference. On April 29, 1958, the examining agent met with Lanier and Hubert T. Campbell, the attorney for the estate. Lanier and Campbell stated to the examining agent that the executor had directed them to advise the agent of a large deposit of currency which the executor believed to be an asset of the estate and which was located in the Leyman Corp.'s safe-deposit box No. 492 at the First National Bank of Cincinnati.

On April 30, 1958, the cash was counted by an agent of the Special Intelligence Division of the Internal Revenue Service, and an accountant employed by Leyman Corp. and found to total $613,314.52 contained in 11 packages. The counting of the cash in the safe-deposit box was the first participation in the investigation by an agent of the Special Intelligence Division of the Internal Revenue Service.

When the executor told Lanier in the latter part of April 1958 of the existence of the currency in safe-deposit box No. 492 and when he told Campbell in Lanier's presence of the existence of this currency on April 28, 1958, he asked Lanier and Campbell to tell the revenue agent examining the estate tax return of the existence of the currency and of his conclusion that it belonged to the estate.

In 1955 the executor personally borrowed $115,000 from Leyman Corp. and Leyman Manufacturing Co. borrowed $105,000. In 1956

Leyman Manufacturing Co. borrowed an additional $5,000 from Leyman Corp.

On January 31, 1961, the executor was convicted upon his plea of nolo contendere of the offense of willfully and knowingly making, subscribing, and causing to be filed the United States estate tax return for decedent's estate which he knew and believed to be not correct, in violation of section 7206(1) of the Internal Revenue Code of 1954 and was sentenced to 1 year and 1 day in prison.

Respondent in his notice of deficiency determined that cash in the amount of $613,314.52 was property of decedent at the date of his death but was not reported in the estate tax return, and that the value of the 2,309 shares of Leyman Corp. common stock owned by decedent at the date of his death and reported in the estate tax return at $195 a share was $850 a share, a total difference in the amount of $1,512,395. Respondent in his deficiency notice determined an addition to tax of $1,930,350.45 designated "fraud penalty."

In the notice of deficiency respondent further increased the value of the estate as reported by the amount of $54,000 with the following explanation:

It also has been determined that certain unreported municipal bonds as hereinafter described in the value of $54,000.00 were owned by the decedent at the date of his death and are includible in his estate tax return:

| Description | Maturity date | Amount |
| --- | --- | --- |
| Willowick, Ohio | 10-1-66 | $5,000 |
| Detroit, Mich | 3-15-58 | 4,000 |
| Asbury Park, N.J | 6-1-56 | 10,000 |
| Redford Township, Mich | 3-15-53-55 | 10,000 |
| Carbondale, Pa | 4-15-56 | 5,000 |
| Cowlitz County, Wash | 12-1-48-66 | 10,000 |
| Chicago, Ill., Transit | 7-1-50-57 | 10,000 |
| Total | | 54,000 |

The five Willowick, Ohio, bonds in the sum of $5,000 were redeemed at various times beginning on June 11, 1948, and ending November 6, 1951.

The four Detroit, Michigan, bonds in the sum of $4,000 were redeemed September 15, 1941.

The 10 Asbury Park, New Jersey, bonds in the sum of $10,000 were redeemed in October 1956 by J. O. Miller, since deceased.

The 10 Redford Township, Michigan, bonds in the sum of $10,000 were redeemed in 1953 and in 1954 prior to the date of death of the decedent.

The five Carbondale, Pennsylvania, bonds in the sum of $5,000 were presented for redemption by J. O. Miller, now deceased, on June 5, 1956.

The 10 Cowlitz County, Washington, bonds in the sum of $10,000 were redeemed on November 27, 1951.

The 10 Chicago, Illinois, Transit Authority bonds in the sum of $10,000 have now been identified as Nos. 35158 to 35167 which were reported as item 25 of Schedule B of the estate tax return.

Currency in the amount of $10,062 was handed by J. O. Miller to the executor in 1957 at the time Miller was retiring. Miller stated to the executor that this currency belonged to decedent. The executor placed this currency in Leyman Corp.'s safe-deposit box No. 492 on April 11, 1957, and the amount thereof is included in the $613,314.52 which was contained in the box at the time the currency was counted by a special agent of the Internal Revenue Service. At the time in 1957 when the currency was handed by Miller to the executor, Miller had become senile to such an extent that he had very little ability to remember facts.

ULTIMATE FACTS

The 2,309 shares of Leyman Corp. stock had a fair market value of $630 per share on May 24, 1954.

The executor knowingly and willfully filed a false and fraudulent estate tax return on behalf of decedent's estate.

OPINION

*Issue 1*

The first issue for decision is the value on May 24, 1954, of 2,309 shares of common stock of Leyman Corp. The petitioner contends that the value of this stock on that date was not in excess of $536 per share, and respondent contends that such value was not less than $700 per share. At the trial the petitioner offered the testimony of two expert witnesses, one of whom stated his opinion of the fair market value of stock of Leyman Corp. on May 24, 1954, to be $536 per share, and the other stated his opinion of the value of the stock on that date to be $400 per share.

Each of the two expert witnesses offered by respondent stated his opinion to be that the fair market value of stock of Leyman Corp. on May 24, 1954, was $700 per share.

One of petitioner's expert witnesses, the one upon whose testimony petitioner primarily relies, testified that in formulating his opinion as to the fair market value of the stock of Leyman Corp. he considered the nature of the corporation's business, its financial condition, its operating ratios, its earnings, its dividend-paying capacity, and the value of its assets. He relied to a large extent on the market value of stock, the earnings, and the earnings paid out as a percentage of invested capital of companies he considered as nearly comparable to Leyman Corp. as he could obtain from data published in standard financial services.

Since Leyman Corp. had investments in both real estate and securities, this witness considered separately the real estate investments and operations of Leyman Corp. which he referred to as the real estate division and its management of its investments in securities which he referred to as the securities division. In addition, in considering the assets of the Leyman Corp., he made another classification as a miscellaneous division consisting of the investment in Leyman Motor Co., Inc., the Dayton Buick Division, and the cash surrender value of the life insurance upon decedent's life. He considered the investment in the Leyman Motor Co., Inc., and Dayton Buick Division as well as the proceeds from the life insurance as cash funds for potential investment by the securities division, since he assumed that the assets of Leyman Motor Co., Inc., and the Dayton Buick Division would soon after decedent's death be converted into cash due to the expiration of the Buick franchises. The witness, of course, admitted that there were differences in the operations of the comparative companies he selected and the operations of Leyman Corp. On the basis of the comparatives used,[1] he came to the conclusion that the real estate division of Leyman Corp. should be valued by applying 58.54 percent to the approximately $3,732,000 adjusted capital invested of the real estate division to arrive at a market value appraisal of the real estate division of $2,179,000 for the purpose of valuing the common stock as opposed to the stipulated fair market value as of May 24, 1954, of the real estate owned by Leyman Corp. of $4,680,442. Following a similar procedure with respect to the securities division,[2] except that 90 percent was applied to the adjusted market value of the securities including the insurance proceeds and the liquidating value of Leyman Motor Co. and Dayton Buick Division, this witness concluded that the fair market value of the securities division of Leyman Corp. on May 24, 1954, would be $4,132,000 as compared with the fair market value of the securities themselves as of May 24, 1954, of $3,584,203.52, a face value of the insurance of $660,000, and a book value of the Leyman Motor Co., Inc., and Dayton Buick Division as of December 31, 1953, of $836,596 and $402,199, respectively. Having arrived at a total valuation of the Leyman Corp. on this basis of $6,311,000, he deducted therefrom $100,000 as estimated future liability under section 102 of the Internal Revenue Code of 1939 and the value of the preferred stock at the price of $100 per share and concluded that the total valuation of the common stock

---

[1] The companies used as comparatives were: Bankers Building Corp., Boston Real Estate Trust, Boston Wharf Co., Chicago Medical Arts Building Corp., Fulton-Carrol Co., Maryland Theatre Building Corp., 100 North LaSalle Street Building Corp., Philadelphia Bourse, Pittsburgh Finance Building Corp., and Wacker-Wabash Corp.

[2] The companies used as comparatives were: Adams Express Co., American International Corp., Boston Personal Property Trust, Consolidated Investment Trust, Inland Investors Inc., National Shares Corp., and Tonopah Mining Co. of Nevada.

equity in Leyman Corp. at May 24, 1954, was $5,738,000 or $610.43 per share. The witness then stated as his opinion that since the stock did not have a public market, a discount should be taken from the figure of 12.2 percent thereof to arrive at the fair market value of the stock. In this regard the witness testified:

We have taken the position that because the stock lacks market—marketability it would not be worth as much as this figure here, which has been determined by reference to other publicly traded stocks, that all other things being equal an investor would not pay as much for unmarketable stock as one with a ready market. And to estimate how much that negative element of value should be, we have computed how much it would actually cost to create a public market through a public offering for the 2,309 shares of stock held in the Leyman Estate. We have made that computation by reference to data put out by the Securities Exchange Commission as to the cost of public flotation, taking into account the size of flotation, and for a block of stock of this size * * * the cost would be 12.2 percent. * * *

Applying the 12.2 percent to the $610.43, this witness arrived at a value of $535.96 which he stated to be his opinion of the fair market value of the stock per share.

Petitioner's other expert witness testified that he considered, in arriving at his valuation of $400 per share, the management of the company, its financial performance, its balance sheet position, and the balance sheet adjusted to take into consideration what in his opinion the liquidating value of the securities and real estate would be. He also testified that he considered the business conditions at the time of valuation and the prices at which comparative securities were sold in relation to their earnings, dividends, and assets. This witness testified that after making adjustments to the balance sheets of Leyman Corp. as of December 31, 1953, and April 30, 1954, to adjust book value to take care of taxes that were paid in 1955 but were applicable to earlier years, to reflect depreciation adjustments by revenue agents, to reflect earnings and surplus from rentals from Central Parkway and Walnut Garage, to adjust life insurance from its book value to its full face value, and in valuing the securities to take off 10 percent from the value of the First National Bank of Cincinnati stock for blockage, that he arrived at an adjusted book value per share of common stock of Leyman Corp. as of April 30, 1954, of $632.04 per share, that the unadjusted liquidating value per share of common stock on the same date was $975.30, and that the liquidating value per share of common stock adjusted for capital gains tax which the witness computed would have to be paid at the rate of 25 percent on the capital gains from the sale of the real estate and securities when the corporation liquidated was $892.14. This witness then testified as to other facts which he considered, such as the earnings per share of stock over the past 5 years which he computed to average $17.64 per share, the dividends paid out per share of stock which he computed at $10

per share, and the earnings with respect to the real estate and securities divisions which he capitalized and also compared with the value of stock of other listed companies in the real estate and securities businesses as compared to their earnings. The companies used by this witness differed from those used by petitioner's other expert witness. On these bases, he arrived at his opinion of $400 per share.

Each of respondent's witnesses approached the problem of valuation by considering that the total assets of the corporation as of May 24, 1954, had a fair market value of $10,534,047. This figure consisted of an addition of the agreed fair market value of the real estate owned by Leyman Corp. as of May 24, 1954, of $4,680,442, the agreed fair market value of the securities portfolio other than investments in subsidiary companies of $3,484,203 plus the book value of the Leyman Motor Co. as of December 31, 1953, of $836,596, and of Central Parkway and Walnut Garage of $1,484 and Eastbourne Garage of $105,569, making a total of $4,427,852. To this was added the book value of the Dayton Buick Division of $402,199 and the cash due from life insurance of $660,000. To this amount was added the cash of the corporation at May 24, 1954, of $154,096, notes receivable of $202,500, automobiles of $5,962, and furniture and fixtures of $995. To determine the net asset value or net worth these witnesses subtracted from the total assets of $10,534,047 the total current liabilities of $715,083 as shown by the corporation's balance sheet of May 31, 1954, thus arriving at a net worth of $9,818,964. To arrive at the common stock equity per share of $994 these witnesses reduced the net worth as determined by $473,000 representing the call price of the preferred stock at $110 per share and divided the remaining net worth by 9,400 shares of common stock outstanding. Each of these witnesses testified that because of the low earnings of this company relative to its net assets and invested capital, the untried management of the company, and the probability of the liquidation of the Buick sales division, and considering that the stock being valued was a minority interest, that their opinion was that the fair market value of the stock would be at a substantial discount from its net asset value of $994. On a strictly judgment determination, considering all the factors relative to the stock, one of the witnesses stated that in his opinion the discount should be somewhere between a minimum of 25 percent and a maximum of 35 percent and so he used the average of 30 percent and arrived at his estimated value of $700 per share merely by multiplying net asset value of $994 by 70 percent. He testified that he attempted to find comparatives for the real estate division, particularly, and was unable to find any companies that he considered to be comparable.

Respondent's other expert witness testified that he arrived at a fair market value of $700 per share by placing upon the stock a dis-

count of approximately 30 percent from its net asset value which he considered a "very deep discount that would normally be applied to investment companies." This witness testified that he had examined the portfolio of securities held by the company and considered them a very good portfolio, mostly of stocks listed on the New York Stock Exchange. The witness stated:

in an investment company of this kind that the investment policies and practices of the company are the most important things to consider because you can take a pool of capital and put it into high yielding investment securities in the form of bonds, I would say, or preferred stock or you can put the pool of capital into stock issues that are paying very little, but have excellent chances for appreciation, so I think that also applies in the case of real estate. * * *

The valuation of stock of a closely held corporation where, as in the present case,[3] there have never been any sales is difficult. The value of the underlying assets, the earnings, dividends paid, and numerous other factors are relevant to the determination. *Estate of Amy H. DuPuy*, 9 T.C. 276 (1947). The opinion of experts is of assistance. Consideration is to be given to the fact that a minority interest is being valued. *Estate of Irene de Guebriant*, 14 T.C. 611, 619 (1950), reversed on another issue sub nom. *Claflin* v. *Commissioner*, 186 F. 2d 307 (C.A. 2, 1951). The management of the company is to be considered. *Estate of Paul M. Vandenhoeck*, 4 T.C. 125, 137 (1944).

After considering all of the evidence of record including all the stipulated data with respect to the financial operations, real estate and stock held by Leyman Corp. on May 24, 1954, as well as the opinions of the four expert witnesses who testified, in light of their qualifications as experts, the methods of valuation used by them, and their knowledge of the facts with respect to the assets and management of Leyman Corp., we have concluded, and so stated in our findings, that the fair market value of 2,309 shares of Leyman Corp.'s stock on May 24, 1954, is $630 per share, and we so hold.

### *Issue 2*

Section 894(a) of the Internal Revenue Code of 1939 states, "FALSE OR FRAUDULENT RETURN.—For 50 per centum addition to the tax in case of a false or fraudulent return, see section 3612(d)(2)."[4]

Section 3612(d) provides for additions to tax and subsection (2) states, "FRAUD.—In case a false or fraudulent return or list is willfully

---

[3] The only indication that any stock has ever been disposed of in any way is the following statement in the 1949 audit report of Leyman Corp.: "During the year under review, 600 shares of the common stock were purchased at a price of $490.00 per share. This stock is shown on the balance sheet as treasury stock at par value. The premium paid, of $233,970.00, was charged to surplus, as shown on Exhibit C."

[4] For reasons discussed later in this opinion, the provisions of secs. 894(a) and 3612(d)(2) of the Internal Revenue Code of 1939 are applicable to this case and not sec. 6653(a) of the Internal Revenue Code of 1954.

made, the Commissioner shall add to the tax 50 per centum of its amount." This section differs from section 293(b) of the Internal Revenue Code of 1939 providing in the case of income tax for the addition to tax because of fraud. That section does not refer to the return, but provides if any part of the deficiency is due to fraud with intent to evade tax, the addition is applicable.[5] In substance, however, the provision that in case a false or fraudulent return is willfully made requires not only showing that a false return was knowingly filed, but that the filing of this return was willful in the sense that it was done with an intent to evade tax. Cf. *Maroosis* v. *Smyth*, 187 F. 2d 228 (C.A. 9, 1951).

Although the wording of the provision is different in the section dealing with income tax from that in the section dealing with estate tax the same quantum of proof of willful intent is necessary in the case of an estate tax return as in the case of an income tax return. The holdings of the cases dealing with the proof necessary to show that an income tax return is false or fraudulent with intent to evade tax are applicable in determining whether a false or fraudulent estate tax return was willfully made. However, in the case of an estate tax return, the fraud must be in making the return and if the fraud even though resulting in an underpayment of tax is not in the making of the return the provisions of section 3612(d)(2) of the Internal Revenue Code of 1939 are not applicable. Cf. *Estate of Henry Wilson*, 2 T.C. 1059 (1943). Any action of the person making the return subsequent to the time the return is filed is material only insofar as it is indicative of the willful intent to defraud in filing the return.

The burden is on respondent to establish by clear and convincing evidence that the executor willfully filed a false or fraudulent return. The stipulated fact that $613,314.52 of currency which was owned by decedent at the date of his death was not included in the estate tax return establishes that the return was false. Cf. *Masters* v. *Commissioner*, 243 F. 2d 335, 337 (C.A. 3, 1957), affirming 25 T.C. 1093.

The sole question here, therefore, is whether the omission of this $613,314.52 of currency from the estate tax return was willful. This is a question of fact to be decided on the basis of all the evidence. The evidence in the record is clear and convincing that the omission of the $613,314.52 was willful.

The executor is a man of intelligence and education. In 1955 he had over 18 years of business experience. He knew that currency which belonged to the estate was required to be reported on the estate tax return. An item such as currency which filled a drawer in a safe-

---

[5] It will be noted that sec. 874(b), I.R.C. 1939, with respect to the exception to the period of limitations on assessment of the estate tax is the same as the provision of sec. 276(a), I.R.C. 1939, dealing with income tax, each providing "In the case of a false or fraudulent return with intent to evade tax" that the tax may be assessed at any time.

deposit box could not reasonably be overlooked. Cf. *Louis Halle*, 7 T.C. 245, 251 (1946), affd. 175 F. 2d 500 (C.A. 2, 1949), certiorari denied 338 U.S. 949.

The only explanation of his failure to report the over $600,000 of currency contained in Leyman Corp.'s safe-deposit box No. 492 given by the executor was that at the time the estate tax return was filed, he believed this currency to be the property of Leyman Corp. and not of the estate. We are unable to accept this explanation in view of the other facts established by the evidence. The evidence shows that the executor was the chief officer of Leyman Corp. after decedent's death, that he had been an officer of that corporation for approximately 18 years prior to decedent's death, that prior to the filing of the estate tax return he had reviewed the balance sheets of the corporation in connection with borrowing money for the corporation and knew that the currency in safe-deposit box No. 492 was not included thereon but that he had not disclosed the existence of this currency to the auditor of Leyman Corp. who was also an attorney, to the attorney for the estate, to any other officer of Leyman Corp., or to anyone even though one of the items which was included in the estate tax return was 2,309 shares of Leyman Corp. stock upon which a value was required to be placed. These facts are clear and convincing that the executor knew that the currency in safe-deposit box No. 492 was not the property of Leyman Corp.

The evidence further shows that in December 1953 or shortly thereafter the executor placed approximately $80,000 in currency in safe-deposit box No. 492. Even though at points in his testimony as a witness called by respondent the executor stated that at the time he sold the bonds from which this currency was obtained and placed the currency in the safe-deposit box, he did not know whether the bonds that he sold belonged to the decedent or to the corporation, the evidence is clear that he must have known the bonds were decedent's property sometime prior to decedent's death since the bonds that were located in the same place as the bonds that he sold at decedent's direction were taken by him shortly after decedent's death and placed in a custodial account for the estate and reported as assets of the estate on the estate tax return. The evidence also shows that the executor accompanied the auditors of the estate from at least 1949 until subsequent to decedent's death when they made a physical check of the securities belonging to the estate, that their audit reports list the securities by name, and that these reports do not include any municipal bonds, which type of bonds was the major portion of the bonds kept by decedent at his house. In testifying as a witness in his own behalf, in a final attempt to justify his position that at the time the estate tax return was filed he believed the cash to belong

to the corporation, the executor in effect conceded that he knew the $80,000 was the property of decedent by stating, "* * * I did not see that cash from 1953 until my father's death * * *. Well, from 1953 to his death * * * he could have given permission for anybody to get into that box. As it turned out he did not but I didn't know that at the time, and there was no specific way that I could identify the cash that Allan Bohmer had given me to place in the box."

The evidence is clear that the only persons with access to Leyman Corp.'s safe-deposit box No. 492 were the decedent and the executor. At another point the executor testified as follows:

Q. When he [decedent] came home, wasn't it quite some time before he could even be up for an hour or so a day?

A. I think he came home in an ambulance as I recall. I wasn't there when he arrived, but he was an ill man after that, there is no question about that.

Q. Do you think then that he was not so ill but what he maybe rode down town and went with you into the safe deposit box 492?

A. I don't think after that time, after him coming out of the hospital that he ever accompanied me to the safe deposit box, no, I don't.

Q. Then at least no later than the time he entered the hospital was he in the safe deposit box?

A. I would say that was probably true.

Q. Wouldn't you say that you are pretty positive that it's true rather than just saying it's probably true?

A. Yes, I will say that is quite true.

The executor had testified that decedent's last hospitalization was in the fall of 1953. From this testimony, it is clear that the executor could not have believed at the time the estate tax return was filed that his father had accompanied any persons to safe-deposit box No. 492 to permit them to withdraw the $80,000, and since the executor was the only other person with access to this box there is no explanation of how any other person not accompanied by decedent could have obtained access to the box unless accompanied by the executor. Much of the other evidence in the record also supports the conclusion that the executor did know at the time the estate tax return was filed that the currency in Leyman Corp.'s safe-deposit box No. 492 was an asset of the estate.

Petitioner argues that the executor's voluntary disclosure to the internal revenue agent investigating the estate tax return through Lanier and Campbell of the existence of the currency supports his testimony that at the time the estate tax return was filed he did not know that the currency was an asset of the estate.

Respondent contends that this disclosure was not voluntary in any true sense since it was made at a time when the investigation of the estate tax return had reached a point that a question as to the source of currency for decedent's purchase of bonds had arisen. A voluntary disclosure, even if made prior to the commencement of an investiga-

tion of a return by an internal revenue agent, does not justify the elimination of the addition to tax for the filing of a false or fraudulent return. Cf. *Auerbach Shoe Co.* v. *Commissioner*, 216 F. 2d 693 (C.A. 1, 1954), affirming 21 T.C. 191; *George M. Still, Inc.*, 19 T.C. 1072, 1077 (1953), affirmed per curiam 218 F. 2d 639 (C.A. 2, 1955); and *Herbert Eck*, 16 T.C. 511 (1951), affirmed per curiam 202 F. 2d 750 (C.A. 2, 1953).

In the instant case the fact that the executor disclosed the existence of the currency, even if this disclosure is considered voluntary, does not overcome the clear and convincing evidence that the executor did know at the time the estate tax return was filed that the currency in safe-deposit box No. 492 was an asset of the estate.

Petitioner's other arguments deal with the fact that the respondent has not established that the bonds sold from which the $80,000 was obtained were municipal bonds or that the bonds which were purchased at that time and returned by the executor to the decedent were a part of the bonds included in the estate tax return. In view of the stipulation that the currency was, in fact, an asset of the estate, the failure of respondent to establish these facts has no bearing on whether assets were omitted from the return. The only relevancy of the municipal bonds is to the extent the executor's actions with respect to these bonds indicate that he knew the currency in the safe-deposit box belonged to decedent.

The other arguments made by petitioner which suggest that had the executor intended to defraud with respect to the estate tax, he might have omitted from the return some of the municipal bonds which were the property of the estate or removed the cash from the safe-deposit box and deposited it in a Swiss bank, in no way overcome the evidence here of fraud. There is no showing in the record that no one other than the executor knew of the existence of the municipal bonds but the evidence does show that the existence of the currency was known only to the executor. Since the executor alone had access to safe-deposit box No. 492, there is no inference to be drawn that there was no attempt at concealing the existence of the currency by not removing it from the country. In fact, petitioner argues that the internal revenue agents probably never would have discovered the existence of this cash in safe-deposit box No. 492 had the executor not disclosed its existence. The evidence is clear and convincing that a false and fraudulent estate tax return was willfully made by the executor.

*Issue 3*

Petitioners contend that even if it is held that the executor willfully made a false or fraudulent estate tax return, the addition to the tax is to be determined in accordance with section 6653 (b) of the Internal

124

Revenue Code of 1954 [6] which provides that if any part of any under-payment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the under-payment. Section 7851(a)(2)(A) of the Internal Revenue Code of 1954 provides that chapter 11 of the Internal Revenue Code of 1954 applies to estates of decedents dying after August 16, 1954, date of enactment of the 1954 Code. Since decedent in the instant case died on May 24, 1954, the provisions of the Internal Revenue Code of 1939 apply to the imposition of the estate tax. Petitioner recognizes that the imposition of the estate tax in the instant case is under the provisions of the Internal Revenue Code of 1939 but argues that the addition to the tax provided by section 3612(d) of the Internal Revenue Code of 1939 is not applicable since no provision of the Internal Revenue Code of 1954 makes it applicable. Petitioner then concludes that under the provisions of section 7851(e) of the Internal Revenue Code of 1954 [7] the reference in section 894(d) of the 1939 Code to section 3612(d) of the Code must be read as applying to section 6653(b) of the Internal Revenue Code of 1954.

Section 7851(a)(6)(D) of the Internal Revenue Code of 1954 provides, "Except as otherwise provided in subparagraphs (B) and (C), the provisions of chapter 28 and of subtitle D of the Internal Revenue Code of 1939 shall remain in effect with respect to taxes imposed by the Internal Revenue Code of 1939." Section 3612(d) of the Internal Revenue Code of 1939 is a part of subtitle D of that Code and sub-paragraphs (B) and (C) of section 7851(a)(6) of the Internal Revenue Code of 1954 do not make any exception with respect to the provisions of section 3612(d). Petitioner contends that under the Internal Revenue Code of 1939 additions to tax were not taxes but were a separate imposition. Even if we accept petitioner's contention that under the 1939 Code additions to the tax are separate from the tax and are not a part thereof,[8] this does not explain away the clear language of section 7851(a)(6)(D) that subtitle D of the Internal Revenue Code of 1939 shall remain in effect *with respect to* taxes imposed by the Internal Revenue Code of 1939. Subtitle D of the Internal Revenue Code of 1939 contains only general administrative provisions

6 SEC. 6653. FAILURE TO PAY TAX.

(b) FRAUD.—If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a).

[7] SEC. 7851(e) [I.R.C. 1954]. REFERENCE TO OTHER PROVISIONS.—For the purpose of applying the Internal Revenue Code of 1939 or the Internal Revenue Code of 1954 to any period, any reference in either such code to another provision of the Internal Revenue Code of 1939 or the Internal Revenue Code of 1954 which is not then applicable to such period shall be deemed a reference to the corresponding provision of the other code which is then applicable to such period.

[8] Our opinion in *E. C. Newsom*, 22 T.C. 225 (1954), takes a contrary view of the addition to tax under sec. 294(d)(2) of the Internal Revenue Code of 1939.

which are applicable to returns, assessments, collections, and similar items with respect to taxes imposed by that Code where not otherwise provided for. Therefore, when the 1954 Code provides that this subtitle remains in effect with respect to taxes imposed by the 1939 Code, we think the language is unequivocally clear that this section is not repealed as to taxes with respect to the impositions of which the 1939 Code remains in effect. Otherwise the section would be meaningless.

## Issue 4

Petitioner takes the position that the addition to tax provided for under sections 871(i), 894(a), and 3612(d)(2) of the Internal Revenue Code of 1939 [9] in case a false and fraudulent estate tax return is willfully made is 50 percent of the deficiency in estate tax and not 50 percent of the entire tax.

It is respondent's position that the provision of section 3612(d)(2) is clear that the addition to tax provided for therein is 50 percent of the entire tax.

In connection with the enactment of section 6653 of the Internal Revenue Code of 1954, the reports of both the House of Representatives and the Senate contain the following statement:

Existing law imposes a 50 percent addition in the case of fraud applicable to all taxes but, in the case of taxes other than income, estate, and gift, that addition is based on the total amount of tax imposed.

S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 591 (1954), and H. Rept. No. 1337 to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. A419 (1954).[10]

In 1 Paul, Federal Estate and Gift Tax, sec. 13.69 (1942), p. 809, the following statement appears: "If there is fraud as to one item, it

---

[9] SEC. 871(i), 50 Per Cent Addition Treated as Deficiency.—The 50 per centum addition to the tax provided by section 3612(d),(2), shall, when assessed in connection with an estate tax, be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 891 shall not be applicable.
SEC. 894(a). Ad Valorem.—
Failure to File Return.—For addition to the tax for failure to file return, see section 3612(d)(1).
False or Fraudulent Return.—For 50 per centum addition to the tax in case of a false or fraudulent return see section 3612(d)(2).
SEC. 3612(d)(2). Fraud.—In case a false or fraudulent return or list is willfully made, the Commissioner shall add to the tax 50 per centum of its amount. [Sec. 3612(d)(2) was derived from sec. 3176 of the Revised Statutes.]
[10] It might be noted that Mertens, Code Commentary, in footnote 4 to sec. 6653 : 1, and footnote 1 to sec. 6653 : 2 also states that the 50-percent addition for fraud in the case of estate tax under the provisions of the 1939 Code was 50 percent of the deficiency. 63-6 C.C.H. Fed. Tax Service, par. 5500, p. 62,005, states :
The 50% is based on the entire amount of the underpayment. Formerly, in the case of income, estate, and gift taxes, the 50% was based on the amount of the deficiency. For all other taxes it was based on the total amount of tax imposed. If the 50% fraud penalty is imposed, the 5% negligence penalty may not be added, and neither may the penalty for late filing (delinquency) be added. Formerly, the delinquency penalty could be imposed in addition to the fraud penalty (¶ 5533.155). The 50% fraud penalty is in substitution, in the case of stamp tax, of the prior 100% penalty (Sec. 6653(e)).

taints the entire return and the penalty will attach to the entire deficiency." The citations following this statement are to income tax cases. At the conclusion of section 13.69, the author explains that the reason the discussion with respect to fraud refers primarily to income tax cases is the lack of estate tax cases involving the question of fraud.[11]

In *M. Cohn & Sons Co.*, 9 B.T.A. 87 (1927), we held that where a taxpayer had filed a return in accordance with the Internal Revenue Act of 1917, 40 Stat. 300, but had failed to file before its due date a return required under the Revenue Act of 1918, 40 Stat. 1057, for the same fiscal year, the addition to tax provided by section 3176 of the Revised Statutes as amended by section 1317 of the Revenue Act of 1918 should be computed on the additional amount due under the 1918 Act and not computed upon the entire amount of the tax for the fiscal year. Section 3176 of the Revised Statutes there applicable provided:

In case of any failure to make and file a return or list within the time prescribed by law, or prescribed by the Commissioner of Internal Revenue or the collector * * * the Commissioner of Internal Revenue shall add to the tax 25 per centum of its amount, * * *

In reaching the conclusion that the 25-percent addition applied to the balance due or deficiency, we stated as follows:

The above quoted section 3176 of the Revised Statutes as amended by the Revenue Act of 1918 provides that a 25 per cent delinquency penalty be added to "the tax" for failure to file the required return. However, that term "the tax" is not clear and unequivocal for sections 205(a) and 335(a) in providing a method for computing "the tax" also provide for a credit, of the tax under the 1917 Act for the same fiscal year, towards the payment of the tax imposed by the 1918 Act. The question arises, does "the tax" as used in section 3176 of the Revised Statutes as amended by section 1317 of the Revenue Act of 1918, mean the total tax as computed under that Act, or does it mean the said total tax less the credit provided for? Under such circumstances the statute is to be construed most strongly against the Government and in favor of the citizen. See *Gould* v. *Gould*, 245 U.S. 15.

Statutes should receive a sensible construction, such as will effectuate the legislative intention, and avoid, if possible an unjust or absurd construction.
See also *In re Chapman*, 166 U.S. 661.

---

[11] The concluding paragraph of sec. 13.69, 1 Paul, Federal Estate and Gift Tax, p. 814, is as follows:

The thoughtful reader may be more impressed by the lack of estate tax cases in the story of tax dereliction than by the principles that govern the determination of fraud. It is curious, at first blush, that recorded, detected fraud should be so scarce in the estate tax picture. Yet the answer may not be far to seek. Executors are faced with a *fait accompli* and may little plan their tax future. Of estate tax planning many advertisements and articles testify that there is plenty, but in estate cases the one who has done the planning is dead and may not be charged with 50 per cent penalties. Those who follow are presented with facts that have no turning. And executors are rarely single in large estates; this may mean something in the fraud equation. Fraud is not so easily done with strangers. Finally, one may add the cynical thought that executors are sometimes not beneficiaries who profit by accomplished and undetected fraud. Taxes may have their effect, as is so often claimed, on incentive; but it is a poor rule that does not work in reverse, and incentive may have its effect on taxes when we remember that he who would take the chance of fraud must have a chance to profit materially by a failure of detection.

The unstrained, natural and just conclusion to be reached upon the reading of the above quoted sections of the Revenue Act of 1918 is that the amount of tax paid under the 1917 Act should be credited against the amount found due for the same fiscal year under the 1918 Act and that if there be a balance due or a deficiency under the 1918 Act then the delinquency penalty should attach to such deficiency. We do not believe that Congress ever intended to penalize a taxpayer for taxes duly paid upon a return made under an existing law. * * *

In *Harrison* v. *Northern Trust Co.*, 317 U.S. 476 (1943), the Court stated:

words are inexact tools at best, and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how "clear the words may appear on a 'superficial examination'" *United States* v. *American Trucking Assn.*, 310 U.S. 534, 543–44 * * *

The provisions for an estate tax first appeared in the Internal Revenue Act of 1916, 39 Stat. 756, as title II of that Act. Section 211 of this title of the 1916 Act provided as follows:

That all administrative, special, and general provisions of law, including the laws in relation to the assessment and collection of taxes, not heretofore specifically repealed are hereby made to apply to this title so far as applicable and not inconsistent with its provisions.

Title II of the Revenue Act of 1916, 39 Stat. 756, dealing with income tax, contained as part III, general administrative provisions. Section 16 thereof provided:

That sections thirty-one hundred and sixty-seven, thirty-one hundred and seventy-two, thirty-one hundred and seventy-three, and thirty-one hundred and seventy-six of the Revised Statutes of the United States as amended are hereby amended so as to read as follows:

* * * * * * *

SEC. 3176. If any person, corporation, company, or association fails to make and file a return or list at the time prescribed by law, or makes, willfully or otherwise, a false or fraudulent return or list, the collector or deputy collector shall make the return or list from his own knowledge and from such information as he can obtain through testimony or otherwise. Any return or list so made and subscribed by a collector or deputy collector shall be prima facie good and sufficient for all legal purposes.

If the failure to file a return or list is due to sickness or absence the collector may allow such further time, not exceeding thirty days, for making and filing the return or list as he deems proper.

The Commissioner of Internal Revenue shall assess all taxes, other than stamp taxes, as to which returns or lists are so made by a collector or deputy collector. In case of any failure to make and file a return or list within the time prescribed by law or by the collector, the Commissioner of Internal Revenue shall add to the tax fifty per centum of its amount except that, when a return is voluntarily and without notice from the collector filed after such time and it is shown that the failure to file it was due to a reasonable cause and not to willful neglect, no such addition shall be made to the tax. In case a false or fraudulent return or list is willfully made, the Commissioner of Internal Revenue shall add to the tax one hundred per centum of its amount.

The amount so added to any tax shall be collected at the same time and in the same manner and as part of the tax unless the tax has been paid before the

discovery of the neglect, falsity, or fraud, in which case the amount so added shall be collected in the same manner as the tax.

The Act of 1918 contained as title II thereof provisions with respect to income tax, and section 250(b) of title II of the Act of 1918 contained the following provisions:

If the understatement is false or fraudulent with intent to evade the tax, then, in lieu of the penalty provided by section 3176 of the Revised Statutes, as amended, for false or fraudulent returns willfully made, but in addition to other penalties provided by law for false or fraudulent returns, there shall be added as part of the tax 50 per centum of the amount of the deficiency.

Title IV of the 1918 Act which dealt with estate tax contained as the last sentence of section 404 dealing with the notice to be given by the executor and the return to be filed, the following:

The Commissioner shall make all assessments of the tax under the authority of existing administrative special and general provisions of law relating to the assessment and collection of taxes.

Title XIII of the Act of 1918 dealt with general administrative provisions, and section 1317 thereof provided in part as follows:

That sections 3164, 3165, 3167, 3172, 3173, and 3176 of the Revised Statutes as amended are hereby amended to read as follows:

\*     \*     \*     \*     \*     \*     \*

Sec. 3176. \* \* \*

In case a false or fraudulent return or list is willfully made, the Commissioner of Internal Revenue shall add to the tax 50 per centum of its amount.

The remaining part of section 3176 as set forth in the Act of 1918 was substantially the same as set forth in the Act of 1916.

The income tax provisions and estate tax provisions of the Revenue Act of 1921, 42 Stat. 227, contained substantially the same provisions insofar as here pertinent as the Act of 1918, and title XIII dealing with general administrative provisions, in section 1311 thereof, reenacted the sections of the Revised Statutes amended by section 1317 of the Act of 1918 without change and set forth in full these provisions as amended.

In the Revenue Act of 1924, 43 Stat. 253, numerous procedural changes were included under title II with respect to income tax. The creation of the Board of Tax Appeals necessitated the establishment of procedures for the filing of a petition with the Board. Title III, part I, of that act provided for estate tax, and part II, for gift tax. This was the first appearance in the internal revenue laws of a gift tax. The estate tax was imposed by section 301 and the gift tax, by section 319. Section 307 of part I of title III, dealing with estate tax, defined deficiency in substantially the same terms as deficiency was defined with respect to income tax. Section 308 (a), (b), and (c), providing as to estate tax for a determination of deficiency by the Commissioner, the sending of the notice thereof, and the filing of a

petition with the Board of Tax Appeals, contained substantially the same provisions as the provisions with respect to income tax. Section 308(g) provided as follows:

The 50 per centum addition to the tax provided by section 3176 of the Revised Statutes, as amended, shall, when assessed after the enactment of this Act in connection with an estate tax, be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of subdivision (e) of this section shall not be applicable.

With respect to gift taxes, the 1924 Act provided in section 324 of part II that—

The tax imposed by section 319 [gift tax] shall be paid by the donor on or before the 15th day of March and shall be assessed, collected, and paid in the same manner and subject, insofar as applicable, to the same provisions of law as the tax imposed by section 301 [estate tax].

In the Revenue Act of 1926, 44 Stat. 9, title II dealt with income tax and contained insofar as here applicable the same provisions as had the 1924 act. Title III dealt with estate tax and likewise contained insofar as here applicable no change from the provisions of the 1924 act. Title XI contained general and administrative provisions and section 1103 thereof contained an amendment to section 3176 of the Revised Statutes which made no change in the statement with respect to the addition to tax where a false or fraudulent return is willfully made. Section 1200 of the general provisions specifically repealed part II of title III called Gift Taxes as of January 1, 1926.

The Revenue Act of 1928, 45 Stat. 791, contained insofar as here applicable the same provisions with respect to income tax and estate tax as the act of 1924. Substantially the same provisions were contained in the Revenue Acts of 1932, 1934, 1936, and 1938 and in the Internal Revenue Code of 1939. Section 894(a) was new in the Internal Revenue Code of 1939.

The provision originally enacted as section 308(g) of the Revenue Act of 1924 became section 871(i) of the Internal Revenue Code of 1939.

Section 308(g) of the Act of 1924, section 871(i) of the Internal Revenue Code of 1939, and the similar provisions of intervening revenue acts are parts of a section dealing entirely with the determination of a deficiency, the petition to this Court, and the collection of the deficiency. In this context the words of section 871(i) of the Internal Revenue Code of 1939 that "the 50 per centum addition to the tax provided by section 3612(d)(2) shall * * * be assessed, collected, and paid in the same manner as if it were a deficiency * * *" can reasonably be interpreted to mean that "the tax" to which the 50 per centum addition is to be made and which is to be assessed and paid as if it were a deficiency refers to the deficiency in the tax.

This interpretation of section 871(i) of the Internal Revenue Code of 1939 is further borne out by the legislative history of the gift tax as reenacted in the Revenue Act of 1932, 47 Stat. 169. Section 520(b) of the 1932 act provided for additions to the gift tax in case of fraud as follows:

(b) Fraud.—If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3176 of the Revised Statutes, as amended.

The reports of the Ways and Means Committee of the House of Representatives (H.Rept. No. 708, 72d Cong., 1st Sess., pp. 27, 30) and of the Finance Committee of the Senate (S.Rept. No. 665, 72d Cong., 1st Sess., pp. 39, 42), in explanation of the gift tax and specifically of this section, stated as follows:

Except for the administrative provisions, which are taken either from the estate tax or the income tax titles of the revenue acts of 1926 and 1928 and incorporated in this title (a resort to the expedient of the incorporation of administrative provisions by reference, as was done in the gift tax law of the revenue act of 1924, being thought unsatisfactory), the aim in framing this title has been to state with brevity and in general terms the provisions of a substantive character.

\* \* \* \* \* \* \*

Sections 511 to 527. General Administrative Provisions

These sections, relating to the determination and collection of the tax, are modeled after either corresponding provisions of the estate tax law or the income-tax law, whichever have been found most adaptable.

The provisions with respect to the addition to gift tax in case of fraud remained substantially the same in the Revenue Acts of 1934, 1936, and 1938, and the Internal Revenue Code of 1939.

The indication from the committee reports with respect to the gift tax provisions in the Revenue Act of 1932 is that Congress did not consider that there was a substantive change from the provisions contained in the Act of 1924 in which the administrative provisions as to estate tax had been incorporated into the gift tax provisions by reference. Also, the indication from these committee reports is that Congress considered the administrative provisions of the 1926 and 1928 Acts as to income and estate tax to be substantively the same and had modeled the gift tax provisions after the sections of whichever such provisions were considered procedurally most adaptable. From these committee reports can be gleaned the intent of Congress to apply the same substantive administrative provisions to income, estate, and gift taxes in the 1932 Revenue Act, which intent would carry over to the Revenue Acts of 1934, 1936, and 1938, and the Internal Revenue Code of 1939 since these administrative provisions as to income, estate, and gift taxes were reenacted therein without

substantial change. Certainly, to have an addition to tax of 50 per centum of the deficiency in case a fraudulent income or gift tax return were filed and an addition to tax in case a fraudulent estate tax return were filed of 50 per centum of the total tax, would be a substantive difference. This, we believe, is contrary to the intent of Congress.

If the provisions of the Internal Revenue Code of 1939 were to be interpreted to impose a 50-percent addition to the total tax in case a false or fraudulent estate tax return were made, it would logically follow that if such a false or fraudulent return were willfully made, the addition to tax would be imposed where there was no understatement of tax liability on the return. In *American Milk Products Corporation* v. *United States*, 41 F. 2d 966 (Ct. Cl. 1930), the Court of Claims in construing the provisions of section 3176 of the Revised Statutes that in the case of failure to make and file a return within the time prescribed by law, the Commissioner shall add to the tax 25 per centum of its amount, stated at page 969:

Conceivably a taxpayer might under a tentative return or upon an extension of time to file, remit an amount which might ultimately be found to equal the correct tax, and never file the return required by the statute. It is clear that in such case he could not escape the penalty notwithstanding all the tax was paid, and the situation is certainly no better or different where he has paid only a portion of the tax.[12]

It is likewise conceivable that an executor might willfully file a fraudulent estate tax return omitting a substantial asset of the estate, but through inadvertence overvalue another asset of the estate to such an extent that there was no understatement of tax on the estate tax return and therefore no deficiency. See *Summerill Tubing Co.*, 36 B.T.A. 347 (1937), in which it was held that a fraudulent income tax return was filed and therefore the statute of limitations had not run, but no part of the deficiency was due to fraud because the omitted item was offset by proper deduction of an equal amount. We do not believe that the 50-percent addition to estate tax for the willful making of a false or fraudulent return was intended unless there was an understatement of tax on the return filed. However, the only statutory support for this conclusion is in construing section 871(i) of the Internal Revenue Code of 1939 when read in conjunction with sections

---

[12] In support of its conclusion that the addition to tax for failure to file a timely return would apply when the entire tax had been timely paid the Court in *American Milk Products Corporation* v. *United States*, 41 F. 2d 966 (Ct. Cl. 1930), stated at page 969:

The penalty imposed is a means of punishment, *United States* v. *Childs*, 266 U.S. 304, and the tax is only the measure of it. * * *

This view appears contrary to the holding in *Helvering* v. *Mitchell*, 303 U.S. 391 (1938), affirming 32 B.T.A. 1093 (1935), that the addition to income tax where a portion of the underpayment is due to fraud with intent to evade tax provided for in sec. 293(b) of the Internal Revenue Act of 1928 is not punitive but is to compensate or indemnify the Government for loss. However, it is still logical that if an addition to tax is to apply to the entire tax it would apply irrespective of whether there is a deficiency. See *West Virginia Steel Products Corporation*, 34 T.C. 851 (1960).

894(a) and 3612(d)(2) of that Code to provide for the 50 per centum addition to tax to be applicable to the understatement thereof on the return or deficiency.

Neither party has called our attention to a reported case involving a false or fraudulent estate tax return, nor have we found any such reported case. We have found three memorandum opinions of this Court, in two of which the returns were held not to be "false and fraudulent." In the case in which the addition to estate tax because of fraud was sustained by this Court the respondent in his notice of deficiency had determined the 50 percent addition as 50 percent of the deficiency determined by him and by amended answer had alleged that the addition should be 50 percent of the entire tax and the taxpayer therein did not contest this redetermination if the Commissioner should otherwise prevail on the issue remaining for decision. The only other case which we have found involving a fraudulent estate tax return is *Stiles* v. *United States*, an unreported case (S.D. Fla. 1958, 2 A.F.T.R. 2d 6391, 58–2 U.S.T.C. par. 11822). In that case a jury verdict was returned that the estate tax return there involved was false and fraudulent. There is no indication that the amount of the addition to tax was a litigated issue in the case.[13]

The only ruling by respondent which might be considered to be applicable with respect to the filing of a false or fraudulent estate tax return which we have found is G.C.M. 22326, 1940–2 C.B. 159, 160–161. This ruling does not specifically mention estate tax. It is entitled, "Section 293.—Additions to the Tax in Case of Deficiency." The syllabus reads as follows:

Internal Revenue Code, Revenue Act of 1938 and Prior Revenue Acts.

The 50 per centum addition to tax for fraud imposed by section 293(b) of the Revenue Acts of 1936 and 1938 does not abate upon the death of the taxpayer but is collectible from his estate and should be asserted in the notice of deficiency.

The same principle applies to identical or similar provisions of prior Revenue Acts and of the Internal Revenue Code; also to the other additions to tax included in Supplement M of the Revenue Act of 1928, corresponding sections of other Revenue Acts and of the Internal Revenue Code, and to the additions to tax provided by section 3176, Revised Statutes, as amended and section 3612, Internal Revenue Code.

G.C.M. 9162 (C.B. X–1, 263 (1931)) revoked, and G.C.M. 15736 (C.B. XIV–2, 325 (1935)) modified.

This ruling contains a lengthy discussion of prior rulings dealing with the provisions of section 3176 of the Revised Statutes from which

---

[13] The only portion of the case referring to the amount of the addition to tax is the following portion of the charge to the jury:

Now, the final issue with which you will be concerned in this case involves the Government's assessment and collection of what is known as the 50% civil fraud penalty, which has been asserted against Mr. Stiles' estate under the provisions of Section 3612 of the Internal Revenue Code of 1939, which states in substance, "In case a wilful, false or fraudulent return or list is made, the Commissioner shall add to the tax 50% of its amount."

the ruling states all the sections of the revenue acts and the Internal Revenue Code of 1939 discussed therein derived. The earliest ruling discussed with respect to section 3176 of the Revised Statutes is an opinion of the Attorney General rendered July 28, 1882 (17 Op. Atty. Gen. 433, 435).

While G.C.M. 22326, *supra*, does not specifically deal with the measure of the addition to tax, it contains no indication that there is a distinction between the addition to tax for filing a false or fraudulent estate tax return from the addition in case a part of a deficiency in income or gift tax is due to fraud.

We believe that a "sensible construction, such as will effectuate the legislative intention" of the provisions of sections 871(i), 894(a), and 3612(d) of the Internal Revenue Code of 1939 is that the 50 per centum addition to tax is to the difference between the correct tax liability and the tax shown on the return or deficiency and so hold.

### Unreported Municipal Bonds

The petition in this case contained as an assignment of error on the part of respondent the addition to gross estate in the amount of $54,000 as the value of municipal bonds owned by decedent at the date of his death but not included in the Federal estate tax return. Respondent denied this allegation.

All of the facts with respect to these bonds were covered in a stipulation of facts filed at the trial which showed that all but $15,000 in value of the bonds had been disposed of prior to the date of decedent's death. Ten Asbury Park, New Jersey, bonds in the sum of $10,000, and five Carbondale, Pennsylvania, bonds in the sum of $5,000 were shown by the stipulated facts to have been presented for redemption in 1956 by J. O. Miller, who at the time of the trial was deceased.

Neither party mentioned the addition to gross estate in the amount of $54,000 representing municipal bonds owned by decedent at the date of his death but not reported in the estate tax return as an issue in the case at the trial. The inference was left that any issue respecting these bonds had been disposed of by stipulation.

Repondent in his brief argues that the gross estate should be increased by the $15,000 representing the bonds which were presented for redemption in 1956 by Miller.

Petitioner in his reply brief argues that whatever presumption of correctness might have originally attached to the notice of deficiency which determined that municipal bonds in the value of $54,000 were omitted from the estate tax return has been destroyed by the stipulation of facts which shows disposition of all except $15,000 of these bonds prior to decedent's death. Petitioner further states that "It is also apparent from the record that if any of the proceeds of the

Asbury Park, New Jersey, or Carbondale, Pennsylvania, bonds were assets of the estate, they were part of the cash in box No. 492 since in 1957 Miller turned over to the executor a substantial amount of cash which the executor placed in box 492."

We do not agree with petitioner that the fact that respondent's determination with respect to certain of the bonds was in error removes the presumption of correctness with respect to his determination in regard to the remaining bonds. The evidence as to the amount of cash which Miller gave to the executor in 1957 and the executor placed in safe-deposit box No. 492 is not extremely precise since the executor did not know the amount given to him by Miller, but we have found as a fact, upon the basis of the executor's testimony and the notations which were stipulated to be contained on one of the wrappers in safe-deposit box No. 492 (although it is not clear whether these wrappers were the ones there when the box was opened for a count of the money on April 30, 1958, or the ones there after the conclusion of this count) that the amount given by Miller to the executor in 1957 was $10,062. There is nothing in the record to show whether this amount came from proceeds of the sale of the Asbury Park, New Jersey, and Carbondale, Pennsylvania, bonds or not. There is nothing in the record to show why these bonds were in Miller's possession or why the cash given by Miller to the executor was in his possession. It is apparent that proof in this regard would be quite difficult since it is stipulated that Miller was deceased at the time of the trial. However, petitioner made no attempt at any proof with respect to these questions, and in this state of the record respondent is sustained in his position that the $15,000 representing the value of the Asbury Park, New Jersey, and Carbondale, Pennsylvania, bonds is a proper item to be included in decedent's gross estate.

It is of concern to the Court that neither counsel apparently considered any issue to exist with respect to the bonds at the time of the trial, but certainly, it was as incumbent upon counsel for petitioner as upon counsel for respondent to inform the Court if such an issue did exist in the case.

*Decision will be entered under Rule 50.*