Estate of Dorothy Cookson, Deceased, Harold W. Cookson, Robert A. Cookson and David E. Cookson, Executors v. Commissioner.
Estate of Cookson v. Commissioner
Docket No. 3828-64.
United States Tax Court
T.C. Memo 1965-319; 1965 Tax Ct. Memo LEXIS 11; 24 T.C.M. (CCH) 1776; T.C.M. (RIA) 65319; December 14, 1965
John H. Eldridge, Russ Bldg., San Francisco, Calif., for the petitioners. Sheldon M. Sisson, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined a deficiency in petitioners' gift tax for the taxable year 1959 in the amount of $14,692.50. The only issue for decision is the fair market value of 8 1/3 shares of common stock of The Cookson Company on April 1, 1959, the date the stock was given as a gift to David E. Cookson by his mother, Dorothy Cookson. Findings of Fact Some of the facts have been stipulated, are so found, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Dorothy Cookson (hereinafter referred to as decedent) filed her gift tax return for the year 1959 with the district *12 director of internal revenue at San Francisco, California. On April 1, 1959, decedent made a gift of a one-sixth interest (8 1/3 shares) in The Cookson Company, a California corporation (hereinafter referred to as corporation), to her son David E. Cookson. The stock was returned at $7,680 per share. Corporation has 50 shares issued and outstanding of fully paid $100 par value common stock. No dividends have been paid and all stock has voting rights. Corporation was incorporated March 22, 1956, and began operations as of July 1, 1956; however, prior to this, the business was operated as a partnership as far back as 1938. The fiscal year of corporation closes each June 30. Decedent and her three sons, named below, were the only shareholders of corporation; its ownership prior to her death on April 30, 1964, was as follows: Before Gift
After Gift
Shareholders
Shares
Ownership
Shares
Ownership
Dorothy Cookson
16-2/3
1/3
8-1/3
1/6
Harold W. Cookson
16-2/3
1/3
16-2/3
1/3
Robert A. Cookson
16-2/3
1/3
16-2/3
1/3
David E. Cookson
0
0
8-1/3
1/6
Corporation manufactures custom designed steel, aluminum, and stainless steel rolling *13 doors in a price range of $200 to $5,000. Corporation's product is of the highest quality and suitable for a wide variety of uses in all types of commercial, industrial, governmental and institutional buildings. Cookson doors meet rigid specifications and provide the greatest possible protection from loss and damage of every kind. They can not stick, swell, bind, split or crack. Their performance is of the highest and they are particularly noted for smooth operation and little maintenance. Where weather, wind or dust is a major problem, its product offers many exclusive patented features. Doors are fabricated only against firm orders, obtained almost exclusively by competitive bidding. Each door is custom built to the specifications of the buyer, and there is no stocking of finished goods whatsoever. Typical length of time from receipt of order to commencement of fabrication is three months. Among corporation's specific products are the following: 1. Cookson Steel Rolling Service Doors are designed for all applications not requiring an Underwriters' Label, and where fire insurance is not a consideration. Cookson Service Doors are fire repellent and afford a high degree of fire *14 protection. 2. Where fire doors are needed, Cookson "Service" Fire Doors are built to the strict requirements of Underwriters' Laboratories and Factory Mutual Laboratories, providing the ultimate in automatic drop fire door protection. 3. Rolling Grilles are designed to combine strength, security against entry, high visibility and free ventilation. 4. Counter Doors are utilized extensively in schools, cafeterias, offices, stores, post office windows and service entrances to provide a counter-closure application. 5. Cookson Side Coiling Closures are constructed with curtains of wood, steel, aluminum, or open grillwork. Selection of curtain type and material depends on the particular installation, whether it is to be installed inside or outside, and on other functional and architectural factors. Frequently, building design and mounting conditions preclude the use of standard rolling doors. There may not be sufficient headroom to accommodate a coil box in the ceiling area, or the space may be too wide for economical installation of standard doors or grilles. In these instances, side coiling closures are utilized. Corporation also has several patents. One patented process is *15 designed to give a more weatherproof door, and another is called "Detectedge" which provides an important factor of safety as optional equipment for motor operated doors. Should an object be in the doorway as the door is closing, a special electrical device automatically stops or reverses the curtain travel. Corporation may receive a particular job because of its patents. "Servire" and "Detectedge" are registered trademarks of corporation. Corporation sells and services its product throughout the United States and Canada with one-third of its sales in California, one-third in the nine states west of the Rocky Mountains, and one-third in the remaining part of the United States and Canada. Corporation's product line has increased over the years and so has the demand for its products. Harold W. Cookson is the corporation's president and is a professional mechanical engineer licensed in the State of California. He is a graduate of Stanford University and is in charge of production, engineering, and design. Robert Cookson is vice-president of corporation and is in charge of estimating the corporation's cost for a product and making appropriate quotations when bids are submitted. *16 David Cookson is the secretary-treasurer of corporation and is in charge of billing and collections. Corporation recognizes that there will be cycles in its business and retains its employees during the valleys in its sales in anticipation of the peaks to be reached. To help finance its growth, corporation has plowed back its earnings and accordingly has not paid dividends. There is no longterm debt owed to outsiders. The only significant long-term obligation at the date of gift was to Copar Associates which was owned by the Cooksons and even that obligation had been reduced by 40 percent in three years. Corporation has about 25 competitors throughout the nation, most of whom produce rolling doors exclusively. The growth of the Cookson partnership is reflected in the following financial data: Fiscal Year
Pretax Net
Ended
Profit After
June 30
Sales
Salaries
1947
$ 85,630
$ 8,174
1948
156,708
6,815
1949
213,951
29,178
1950
212,026
13,020
1951
301,300
13,064
1952
613,865
117,730
1953
779,282
121,989
1954
938,042
108,402
1955
1,012,410
63,605
1956
1,566,152
185,887
Corporation's balance sheets as of July 1, 1956, and *17 June 30, 1957, through June 30, 1959, are set forth below: At Commencement of Operations July 1, 1956 and at Close of Fiscal Years Ended June 30, 1957 to 1959 ASSETS
7/1/56
6/30/57
6/30/58
6/30/59
Current: Cash
$ 79,009
$ 95,928
$130,596
$102,706
Marketable Securities
0
0
0
19,869
Total Receivables
257,606
331,709
361,377
426,176
Total Inventories
186,545
228,872
230,737
314,798
Prepayments
3,053
2,913
5,025
3,241
Total Current Assets
$526,213
$659,422
$727,735
$866,790
Fixed Assets (after depre-
ciation)
27,567
31,006
43,541
40,463
Goodwill
1
1
1
1
Total Assets
$553,781
$690,429
$771,277
$907,254
LIABILITIES AND CAPITAL
Current Liabilities
$371,213
$364,756
$341,320
$400,700
Loans & Notes Payable (pri-
marily to Copar Associates)
150,000
150,000
127,500
96,250
Stated Capital - 50 shares
32,568
32,568
32,568
32,568
Earned Surplus
0
143,105
269,889
377,736
Total Liabilities & Capital
$553,781
$690,429
$771,277
$907,254
The following table reflects the profit and loss of corporation for each of its three fiscal years ended June 30, 1957, 1958, and 1959, as well as its earned surplus: *18 Years Ended June 30
1957
1958
1959
GROSS SALES AND INCOME: Doors fabrication
$1,596,255
$1,706,010
$1,817,328
Doors erection
172,146
146,726
177,549
Freight and shipping
98,350
89,835
88,119
Sales vents
63,304
37,877
21,265
Other income
4,206
7,122
4,217
Total sales
$1,934,261
$1,987,570
$2,108,478
DIRECT COSTS AND EXPENSES: Shop labor and fringe
$ 219,274
$ 247,752
$ 314,093
Materials purchased
824,002
851,660
949,918
Inventories - (increase) or decrease
( 42,328)
( 1,865)
( 84,061)
Erection labor and fringe
80,236
87,847
105,552
Freight and shipping
105,234
89,845
89,798
Commission to agents
30,602
34,528
54,850
Total direct costs
$1,217,020
$1,309,767
$1,430,150
INDIRECT COSTS AND EXPENSES: General payrolls: Engineering
$ 58,751
$ 78,241
$ 92,472
Sales
29,728
31,966
32,416
Office
43,838
40,760
44,893
Officers
67,500
68,371
70,955
Fringe
3,681
3,942
6,664
Total general payroll
$ 203,498
$ 223,280
$ 247,400
INDIRECT COSTS AND EXPENSES: Other transportation
$ 16,340
$ 14,321
$ 18,202
Other fabrication, shop supplies
31,039
26,294
31,141
Shop rental
24,121
30,005
30,185
Depreciation
10,679
10,319
16,493
Insurance
3,616
4,597
6,116
Taxes
3,182
11,465
8,441
Advertising and catalogue
27,085
32,967
36,865
Other selling expenses
14,789
13,148
15,412
Office Expenses
23,904
25,292
25,086
Other general expenses
31,083
25,050
18,775
Total indirect costs
$ 389,336
$ 416,738
$ 454,116
Total costs and expenses
$1,606,356
$1,726,505
$1,884,266
Pretax net profit
$ 327,905
$ 261,065
$ 224,212
Income and franchise taxes
184,800
134,281
116,365
Net profit for the year
$ 143,105
$ 126,784
$ 107,847
EARNED SURPLUS: Balance to begin year
$ 0
$ 143,105
$ 269,889
Earned surplus ending, per bal-
ance sheets
$ 143,105
$ 269,889
$ 377,736
*19 At the date of the gift, corporation's quarterly sales were at an all-time high; however, at the same time its new orders were decreasing. At the date of the gift the annual earnings per share of corporation were $2,157. The net worth per share as of June 30, 1959, was $8,206. In his statutory notice of deficiency, respondent determined that the fair market value of this stock per share was $16,788 at the date of the gift. Ultimate Finding of Fact The fair market value of the common stock of corporation as of April 1, 1959, was $9,000 per share. Opinion Petitioners contend that the fair market value of corporation's stock as of April 1, 1959, was not in excess of $7,680 per share, while respondent argues that the value was not less than $16,000 per share. For reasons stated below, we do not fully agree with either party's statement as to the value of corporation's stock as of the crucial date. Petitioners and respondent each offered the testimony of an expert witness, both of whom possessed the requisite qualifications to express an opinion as to the value of stock. The two expert witnesses had full knowledge of all the facts of this case. Petitioners' expert was of *20 the opinion that the value of the stock, per share, was its book value (at the date of the gift), which was $7,680. Respondent's expert was of the opinion that the value of the stock, per share, was $16,000. The witnesses explained how they arrived at their respective values. Petitioners' expert relied almost exclusively for his valuation on the fact that a prospective purchaser of these shares would have no outlet for the stock in case of a future desire to dispose of the shares. For this reason he felt the stock was not worth more than its book value. On the other hand, respondent's expert felt that the prime factor in evaluating the stock was the earning capacity of the corporation. He approached the task of valuation from the point of view of a long-range investment and was of the opinion that based upon corporation's high earnings per share the stock was worth not less than $16,000 per share. While we agree that the factors used by the experts are valid and appropriate under the circumstances, we do not believe that either expert has given sufficient consideration to the other relevant factors necessary in arriving at a true valuation of the stock. The determination of the *21 fair market value of stock of a closely-held corporation where, as here, there has been no previous sales of the stock is a very difficult task. The determination is of necessity a factual one which must be based upon all the relevant facts and circumstances of the individual case. Prior cases on the subject, though by no means controlling because of the factual nature of the issue, are relevant in that they set forth the factors to be considered. The appropriate weight to be given to any one factor will depend upon the facts of the particular case. Those factors usually considered are: past and expected future earnings; trend of the earnings; dividend-paying capacity, as well as dividends actually paid; financial liquidity and stability; book value of stock; minority or majority interest involved nature of corporation's product; competition and diversification; success of management; and the general economic conditions and outlook. See Estate of Harry Stoll Leyman 40 T.C. 100, 119 (1963), modified on other isues 344 F. 2d 763 (C.A. 6, 1965); sec. 25.25122(f), Gift Tax Regs. While respondent's expert did utilize some of the aforestated factors in arriving *22 at his valuation, we believe he did not give adequate consideration to such factors as: a minority interest involved; lack of payment of dividends, downward trend of earnings; lack of diversification of products; increased competition; and outlet for stock. We recognize that corporation's earnings during the year the gift was made were $2,157 per share. However, while corporation's sales were increasing at the rate of approximately $100,000 per year, its net earnings were decreasing by approximately $17,000 per year. We believe this downward trend, a factor not given due consideration by respondent's expert, is, under the circumstances of this case, an important factor affecting the valuation of the stock. While we tend to agree with petitioners' expert that shares representing a minority interest in a close family corporation do not offer a ready outlet for the stock, we believe this factor, though important, is not the only one which should be utilized in arriving at the value of the stock in issue. We believe petitioners' expert did not give adequate consideration to such factors as: the rapid growth of corporation over a short period of time, large earnings per share, and the *23 proven ability of management. We have carefully examined and analyzed all the evidence contained in this record bearing upon the valuation of the stock in question. We have carefully considered the opinion of the expert witnesses in the light of our comments above. We recognize that valuation is necessarily an approximation derived from the evaluation of elements not readily measured. Based upon our evaluation of the evidence and giving proper consideration and appropriate weight to all the factors set forth above as established by this record, we have concluded and have so found as an ultimate fact that the value of corporation's stock as of April 1, 1959, was $9,000 per share. Decision will be entered under Rule 50.