ESTATE OF HENRY MONROE SPRINGER, VERA SPRINGER JONES, EXECUTRIX, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 100125.   Promulgated November 5, 1941.

*Floyd E. Wright, Esq.*, and *William H. Wright, Esq.*, for the petitioner.

*Angus R. Shannon, Jr., Esq.*, for the respondent.

568

TURNER: The principal question presented in this proceeding is whether farm and ranch properties conveyed by the decedent during his lifetime to his daughters and grandchildren were transferred in contemplation of death within the meaning of section 302 (c) of the Revenue Act of 1926, as amended, and were therefore a part of his gross estate. The determination of this question depends upon the impelling cause or motive for making the transfers. If the thought of death was the impelling cause, they were made in contemplation of death within the meaning of the statute. If the dominant motive was associated with life rather than death, the statute has no application. *United States* v. *Wells*, 283 U. S. 102, and *Colorado National Bank of Denver* v. *Commissioner*, 305 U. S. 23. The statute provides that "any transfer of a material part of his property in the nature of a final disposition or distribution thereof made by the decedent within two years prior to his death without such consideration shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title."

With respect to the transfers of the two farms deeded by the decedent to Vera Springer Jones in 1926, we are convinced that such transfers were not made in contemplation of death. For several years Vera Jones and her husband had been living on and managing the decedent's farms in Wyoming. They also were operating a small store situated on one of the farms and lived in two small rooms in the back of the store. They were not at all satisfied and had often expressed their feelings to the decedent. They remained, however, upon the decedent's request and his assurance that he would "make things right" if they did stay while he lived. They complied with the decedent's request and the transfers resulted. Furthermore, the decedent had already helped his two older daughters to acquire their homesteads and felt that these transfers to Vera

Jones would equalize his gifts to his three daughters. These facts, in our opinion, demonstrate that contemplation of death was not the motive for the transfers to Vera Jones under the deeds executed in 1926.

An entirely different set of circumstances surrounds the conveyances made in 1935. Decedent at that time was 75 years old. He had accumulated a substantial estate and felt that his farm lands were the most important part of that estate. It was his desire and hope that these lands would continue to be held by members of his family after he was gone. He previously had aided each of his three daughters in establishing themselves with their husbands on properties of their own, and in 1935 decided to and did divide all of his farm and ranch lands among his daughters and the three children of Vera Springer Jones. These transfers having been made within two years prior to decedent's death, the statutory presumption that they were made in contemplation of death attaches and the burden is on petitioner to show otherwise.

It is the claim of petitioner that the presumption has been overcome by proof and that the dominant motive behind the transfers has been shown to have been associated with life rather death. In substance the argument of the petitioner seems to fall into three parts: (1) That the decedent "was in excellent health both before and after" the transfers and there was nothing about his physical condition at the time the transfers were made to prompt anything resembling a testamentary disposition of property; (2) that one reason for making the transfers in 1935 was that the decedent understood that the gift tax rates would be increased in the succeeding year and that the gift tax "is certainly a matter associated with life" and not with the thought of death; and (3) that the transfers had been contemplated for some time and were made by the decedent both for the purpose of relieving himself of the continued burden of management of the properties and because he desired that his daughters should have the benefits of the properties and the responsibility of looking after the land while he was still alive and able to advise with them in their management.

In support of her contention that the decedent was in excellent health and there was nothing about his physical condition at the time of the transfers to prompt anything resembling a testamentary disposition of property, petitioner points to the testimony of Dr. Ohme, which was to the effect that the decedent was in excellent health, and to other testimony that decedent had not been known to have had a serious illness until that which caused his death, and, except for the fact that he no longer managed any farms, his business activities continued much the same up to the date of his death.

These things, the petitioner says, negative the proposition that the transfers were made in contemplation of death. Much of the argument between the parties centers around the condition of petitioner's heart. Dr. Ohme's testimony was that decedent had no heart trouble and knew that the pains in the vicinity of his heart were gas pains. On the other hand, the testimony of Carl G. Weaver, supported by the testimony of Tallon and by the report of a general physical examination of decedent at the Wheatland General Hospital in 1933, convinces us that the decedent thought he was afflicted with heart trouble. Vera Springer Jones testified that she had urged both her father and mother to submit to a physical examination and the examination at the Wheatland General Hospital had followed. Dr. Ohme indicated that he was familiar with the report. One page, designated "History and Preliminary Examination", contained much information, obviously obtained from decedent. That statement disclosed that the decedent had been suffering from pains over his heart, "at first" associated with gas in his abdomen. The statement of the examination indicated an enlargement of the heart. It may be that the enlargement of the heart disclosed by the examination was not serious, but such statement of enlargement was nevertheless contained in the report and we have no reason to doubt that the decedent was familiar with that report. Subsequent acts and statements indicated a fear on his part that he had serious heart trouble. He so advised Carl G. Weaver in January 1937. Weaver is a revenue agent, but was engaged in income tax work and was not concerned with estate and gift tax matters, nor with the state of decedent's health. With Tallon, decedent's representative in tax matters, he had called to discuss some matters pertaining to decedent's income tax returns for 1933 and 1935. Tallon did not remember decedent's statement that he was suffering from angina pectoris, but he did remember decedent's remark with respect to his bad night and the pounding in his chest. We have no doubt that Weaver correctly recounted the substance of decedent's conversation and that decedent told Weaver that he was suffering from angina pectoris and might die at any time or with care might live for a long time. In the light of this testimony, claims of the petitioner that there was no heart condition and the testimony of Dr. Ohme that the decedent knew that the pains in the vicinity of his heart were gas pains and that the average individual is fully aware that such pains are attributable to gas and not heart trouble lose their force as indicating decedent's state of mind with respect to his condition.

As to the gift tax, we are convinced that the decedent knew little, if anything, about it and that the imminence of a change in the gift tax rates had nothing to do with the transfers occurring in 1935, even

though it be assumed for present purposes that a transfer motivated by a possible increase in gift tax rates is, as the petitioner contends, a matter associated with life and not with the thought of death. It may be that the decedent had considered the possibility of avoiding estate or inheritance taxes or the lessening of his income and general tax burdens by making the transfers in question and had discussed those possibilities with some of the witnesses. The circumstances under which the gift tax return was prepared and filed in 1936, the inclusion in that return of properties conveyed in 1926, and the conversations between the decedent and Tallon leave no doubt in our minds, however, that the decedent knew little, if anything, about gift taxes prior to the time Tallon suggested to decedent's son-in-law, Oliver L. Jones, that a gift tax return should be filed.

More difficult of determination is the petitioner's claim that the transfers were prompted by the desire of the decedent to give to his daughters and grandchildren the immediate benefits of ownership of the properties while he was still alive and able to advise in their management and that the transfers were not therefore made in contemplation of death. Considerable testimony was offered in support of the claim stated. The decedent, it would seem, had discussed the matter quite freely with numerous individuals, and the witnesses who testified about such conversations included two of decedent's daughters, his niece and her husband, his tax consultant, and the cashier and teller at the First National Bank of Mitchell. One difficulty in giving to the testimony of these witnesses the weight desired by the petitioner is that the witnesses in many instances appeared to be laboring over the phraseology of their answers instead of giving simple expression to the thoughts contained in the statements attributed to the decedent. Another difficulty from the petitioner's standpoint is that much of the testimony would give equal support to the proposition that the decedent was discussing his plans for the disposition or division to be made of his property at death. To Vera Springer Jones, for instance, he had explained that his greatest aim in life was to build an estate for his family and expressed the hope that his children would always keep the property so accumulated. He told his daughters that it was his intention to divide his lands among them. To his nephew he had expressed the intention of giving his property "to his heirs, the ones he wanted to have it." Other statements made to Vera Springer Jones and his niece, Retta Elliott, might well have been directed to the property conveyed to Vera Jones in 1926 and have had to do with her management of the properties then conveyed. On the other hand, statements by a father to the effect that transfers to his children were made for the purpose of relieving himself of the continued burden of managing the properties

conveyed and because of his desire to give his children the benefit of ownership as well as the responsibility of looking after the properties while he was still alive and able to advise them might under proper circumstances be regarded as justifying the conclusion that the transfers were not made in contemplation of death. Here, however, the husband of each of the decedent's daughters was experienced in managing and operating farm and ranch properties and the decedent himself had already shifted the management of his properties to Oliver L. Jones, husband of Vera Jones. At the time the gift tax return was prepared the decedent made a statement to Tallon somewhat as follows: "Of course, I let down work and haven't worked for several years, but I have a son-in-law who is taking the—looking after the farms and doing the supervision of the farms and feeding the sheep. I have let down quite a little since then." That statement certainly indicates no thought or feeling on the part of the decedent that continued participation by him in the management of the properties was either necessary or intended. By earlier transfers he had already established each of his daughters on homesteads of their own and the 1935 transfers accomplished the final and ultimate division among his children and grandchildren of all his remaining farm lands—considered by him as the most important part of the estate he had built for his family. The properties were conveyed to the natural objects of his bounty, "his heirs, the ones he wanted to have it." We are convinced that in making the 1935 transfers the decedent was taking what he considered the most important step in winding up his affairs, in putting his house in order, and with respect to those transfers we are of the opinion that they were made in contemplation of death within the meaning of the statute; surely petitioner has not overcome the statutory presumption that they were.

The remaining issues call for the determination of the fair market value of the decedent's home in Mitchell, 100 shares of stock in the First National Bank of Mitchell, 37 shares of stock in the First National Bank of Morrell, and a promissory note of decedent's son-in-law, L. D. Merchant.

A witness was called by each party to testify as to the fair market value of the decedent's home on the date of his death. From these witnesses various facts were brought out concerning the property, its age, condition and location in the town of Mitchell, together with various facts concerning the town which might have a bearing on the value of such property. From the evidence it is our conclusion, and we have found as a fact, that the fair market value of the house and lot on March 9, 1937, was $5,500.

The stock of both the First National Bank of Mitchell and the First National Bank of Morrell was closely held and it was seldom

that any stock of either bank was sold. The banks to some extent were controlled by the same individuals. They were prosperous and in very sound condition. Facts and data concerning their capitalization, earnings and dividends, surplus and undivided profits, and the book value of the stock of each institution were submitted. Witnesses were called to express their opinions as to value. The petitioner took particular exception to the methods or formulas used by the respondent in making his determinations. We have often noted in our opinions that no set rule or formula is required in arriving at the fair market value of corporate or bank stock. One method might appear more readily applicable in one case and not in another. The end sought is the fair market value and not the method of arriving at value. After reviewing the testimony of the witnesses and other evidence tending to show the fair market value of the stock of the two banks, we have concluded that the respondent was justified in his determination that the fair market value of the stock of the First National Bank of Mitchell on March 9, 1937, was $290, while the fair market value of the stock of the First National Bank of Morrell on that date was $300.

The note of L. D. Merchant was listed in the estate tax return as having no value. The face amount was $2,139.27 and the respondent has determined that it had a fair market value in that amount at the date of decedent's death. The note was dated March 7, 1927, and was payable six months after date. No payment of interest or principal was ever made and the record does not show whether the decedent at any time made an effort to collect it. The only argument advanced by the petitioner in support of her claim that the note had no value is that the statute of limitations on collection had run long prior to the date of the decedent's death. She has submitted no information concerning the ability of Merchant to pay the note. From the evidence it appears that Merchant was living in the State of Wyoming at the time the note was made and moved to New Mexico a year or so later, where he has since been engaged in the ranching business. The respondent, answering the petitioner's contention as to the statute of limitations, points to section 20–214 of the Nebraska Statutes, which provides that where an individual is out of the state "the period limited to the commencement of the action shall not begin to run until he comes into the state * * * and the time of his absence * * * shall not be computed as any part of the period within which the action must be brought." The facts of record do not show, as the petitioner claims, that the statute of limitations had run. See *Edgerton* v. *Wachter* (Nebr., 1880), 4 N. W. 85. There being no bar to collection of the note and the petitioner having failed to show the inability of Merchant to pay the note.

.the action of the respondent in including the Merchant note in the gross estate of the decedent at its face value is sustained. Cf. *Leo Stein*, 4 B. T. A. 1016.

In the notice of the deficiency the respondent stated that no credit was allowed in respect of estate, inheritance, legacy, or succession taxes paid the State for the reason that evidence as to payment of such taxes required under article 9 of Regulations 80 had not been submitted. By his answer he now admits that the evidence has been submitted and effect should be given thereto in recomputing the deficiency hereunder.

*Decision will be entered under Rule 50.*