Estate of Saul A. Levine, Albert K. Levine, Executor v. Commissioner.
Estate of Levine v. Commissioner
Docket No. 4484-65.
United States Tax Court
T.C. Memo 1968-54; 1968 Tax Ct. Memo LEXIS 243; 27 T.C.M. (CCH) 284; T.C.M. (RIA) 68054; April 2, 1968. Filed Joseph Steinberg and Donald Steinberg, for the petitioner. Jay S. Hamelburg and Robert D. Whoriskey, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency in the estate tax of the Estate of Saul A. Levine in the amount of $32,590.98. Concessions have been made by both parties and the only issues remaining for our consideration are: (1) Whether certain shares of stock in the name of the decedent at the time of his death were actually owned by his brother, and (2) The value of certain claims which the decedent had against named individuals at the time of his death. Findings of Fact Some of the facts are stipulated and are so found. Albert K. Levine *244 (hereinafter sometimes called Albert), has been executor of the estate of his brother, Saul A. Levine (hereinafter sometimes referred to as Saul), since Saul's death, and has resided in 285 Flushing, New York. Saul's estate tax return was filed with the district director of internal revenue, Upper Manhattan, New York, in October 1962. Amended estate tax schedules, including schedules B (stock and bonds) and F (showing the claims against Simonson and Cassell, hereinafter identified) were given to an examining agent of the Appellate Division of the Internal Revenue Service while the return was being audited, and near the end of 1964 or in 1965. In 1951 Albert and Saul together purchased 200 shares of Thiokol Corporation (name subsequently changed to Thiokol Chemical Corporation and hereinafter sometimes referred to as Thiokol). Albert paid for his protion of these shares but allowed Saul to have all of them issued in his name so that Saul could present a more affluent appearance to those from whom he wished to obtain funds for various oil and gas ventures. It was a common practice of these brothers for Albert to advance funds and invest jointly with Saul. Albert kept a record *245 of their joint transactions, and from time to time they would settle accounts between themselves. In 1952 Saul exercised stock rights in Thiokol, which had been received as a result of the earlier purchase, obtaining seven more shares for himself and seven more for Albert. Written memoranda of the puchases appearin two letters from Saul to Albert. In a letter dated June 12, 1952, Saul wrote: We have now jointly 214 shares of Thiokol - 14 as a result of wts. and * * * [at] a cost of $9 - The stock closed Friday at 20 1/8. * * * The second letter, dated June 23, 1952, states: Incidentally you own 107 shares of Thiokol - i exercised the warrant permitting purchase at 9. * * * From 1954 through 1957 Saul annually received 5 percent common stock dividents from Thiokol. At least three shares of stock received pursuant to these dividends were sold by him in 1957. On January 22, 1958, Thiokol stock split two for one. On February 4, 1958, Saul sold two hundred shares of his Thiokol stock, and paid the capital gains tax thereon. In November 1958 Saul received a 5 percent stock dividend on the remaining shares of Thiokol. On February 24, 1959, Saul bought 100 shares of Thiokol *246 for his own account. On March 2, 1959, he sold 100 shares of Thiokol for his own account, and paid the capital gains tax theron. On April 30, 1959, Thiokol stock split three for one. In November of that year, Saul received a 2 percent stock dividend from Thiokol. On December 9, 1959, Saul sold 100 shares of Thiokol on his own account and showed this transaction on his 1959 income tax return. In November 1960, Saul received a 2 percent stock dividend on the remaining shares. At various times in 1959 and 1960, Saul sold eight shares on his own account. At the time of his death on January 17, 1961, there were 903 shares of Thiokol Chemical registered in Saul's name. On schedule B of Saul's estate tax return, petitioner included 903 shares of Thiokol as part of the estate. On the amended schedule B petitioner showed 51 shares as belonging to Saul Levine and 852 shares as belonging to Albert Levine. Of the 903 shares of Thiokol Chemical in Saul's name at his death, 842 were shares belonging to Albert. At the time of his death, Saul was in the process of pursuing a claim against Seymour J. Cassell of Denver, Colorado. Subsequent to his death, the attorney for the estate, Dorothy *247 Appel (now Dorothy Appel Botwen, hereinafter sometimes referred to as Dorothy Appel or Appel), retained counsel in Denver to continue the pursuit. When the estate tax return for Saul's estate was filed, the claim was still being litigated. Its value was shown on schedule F as $6,250 and was accompanied by the following explanation: 6. Claim against S. J. Cassell for 2500 shares of Consolidated Oil & Gas Corp. * * * [at] 2 1/2 now in litigation in the State District Court, Denver, Colorado 6,250.00. On January 2 and February 1, 1963, judgments were obtained against Cassell in the District Court, City and County of Denver, in the principal amounts of $2,375 and $6,747.04, respectively. However, in 1964, Appel learned that Cassell could not be located and recommended to petitioner that further efforts to collect on the judgment be abandoned. Her advice was followed and at the date of trial of this case no amount had been collected on the judgment. On amended schedule F the claim against Cassell was listed as "Valueless." 286 The claim against S. J. Cassell had a fair market value at the date of Saul's death of $6,250. Petitioner concluded that on the date of Saul's death, *248 Albert Simonson owed Saul $1,000 as a result of various loans. Sometime before the estate tax return was filed, the attorney for the estate, Dorothy Appel, instituted legal proceedings in New York in pursuance of the claim. On the estate tax return, the claim was valued at $1,000 along with a notation to the effect that the claim was "In litigation in the Civil Court, New York City, N. Y." The attempt to collect the $1,000 failed. An answer to petitioner's complaint in the action claimed that there had been an accord and satisfaction of the amount. In addition, evidence submitted to Appel in a pretrial examination indicated that there were already several sizable judgments outstanding against Simonson. Based upon the above information, Appel recommended that no further steps be taken. At the time of trial of this case, no amounts had been received in regard to the claim. On the amended schedule to the estate tax return the claim against Albert Simonson was shown as "Valueless." At the date of death of Saul Levine, the claim against Albert Simonson had no value. Opinion All of the issues in this case involve the determination of either the extent of decedent's interest in *249 certain property or the value of property owned by him for purposes of determining his gross estate under sections 2031(a) and 2033 of the Internal Revenue Code. [1]
Petitioner claims that of 903 shares of Thiokol Chemical stock in the name of Saul Levine, 852 shares were actually those of Albert Levine. At the threshold we point out that petitioner has the burden of proof on this issue and the other issues discussed infra. Respondent in his brief *250 states that, as regards the stock issue, petitioner's burden is to show by clear and convincing evidence that Albert in his individual capacity and not the estate is the owner of some of the shares, both under this Court's rules and under New York law, citing Estate of Harry Stoll Leyman, 40 T.C. 100, 120 (1963), reversed on other grounds, 344 F. 2d 763 (1965); Estate of Philip McRae, 30 B.T.A. 1087 (1934); In re Booth's Will, 215 App. Div. 516, 213 N. Y. Supp. 684 (1926); In re Douglas' Estate, 7 N. Y. S. 2d 870 (1938). We make no findings as to the burden of proof required by New York law, as that is not a consideration which may affect our determination. J.Z. Todd, 3 T.C. 643 (1944), remanded on other grounds, 153 F. 2d 553 (C.A. 9, 1945); Herbert L. Damner, 3 T.C. 638 (1944). [2]
*251 As for the proposition that petitioner is under the clear and convincing evidence standard in this Court, we find nothing in the cases cited or in any other case to support such a proposition. The Leyman case, supra, refers to the burden of proof which is on respondent in a fraud case. There is nothing in the McRae case, supra, to indicate that petitioner's burden on any issue was greater than that which is normally placed upon it. Therefore, we reject respondent's contention that petitioner's burden in the instant case is any more severe than to show by a preponderance of the evidence that the Commissioner erred in his determination. Valetti v. Commissioner, 260 F. 2d 185 (C.A. 3, 1958), reversing on other grounds 28 T.C. 692. We find, under this burden, petitioner has established that Albert owned 842 of 287 the 903 shares of Thiokol. The uncontradicted evidence establishes that in 1952 Albert owned 107 shares of the stock. Saul wrote two letters stating that Albert owned 107 shares of Thiokol in 1952. Albert confirmed the statements in the letters by his testimony. Miriam Bartlett, the sister of Saul and Albert, testified that Saul had told her *252 that Albert and he together owned Thiokol stock. The statements by Saul were against his pecuniary interest and Miriam's relation of this latter statement was also against her pecuniary interest, as she stands to inherit some of the Thiokol stock found to be Saul's at the date of his death. Therefore, having found that Albert did have an interest in the Thiokol shares in 1952, it remains for us to determine the extent of his interest at Saul's death. We believe Albert's testimony that he did not authorize Saul to sell any of his shares. Saul, by reporting all sales on his income tax returns as being solely on his own account, confirmed Albert's testimony. However, the record does not support a finding that Albert owns as many as the 852 shares which he claims. The evidence presented in the case included letters from Saul confirming Albert's ownership of 107 shares of Thiokol in 1952, Saul's income tax returns for the years 1958 and 1959, reports on Thiokol Chemical published by Standard & Poor's Corporation for their "Standard Listed Stock Reports," and reports published by Commerce Clearing House ("Capital Changes Reporter," Volume 4). These reports summarize the activities *253 of Thiokol Corporation from its inception in 1930 through 1965. After analyzing the information gained from all of these sources and after evaluating the testimony of the witnesses, we have concluded that all the purchases and sales of Thiokol stock made by Saul after 1952 were for his own account and with respect to his own stock and that none of Albert's stock was sold. We have prepared the following table which represents our finding that Albert owned 842 shares of Thiokol at the date of Saul's death. Saul'sShares
Albert's Shares
1952 - Balance
107
107
12-10-54 - 5% stock dividend 5
5
Balance
112
112
12-9-55 - 5% stock dividend 6
5
Balance
118
117
12-29-56 - 5% stock dividend 5
6
Balance
123
123
11-20-57 - 5% stock dividend 6
6
Balance
129
129
Sold 3 [3]
Balance
126
129
1-22-58 - 2-1 split - Balance
252
258
2-4-58 - sold 200 [200]
Balance
52
258
11-18-58 - 5% stock dividend 3
12
Balance
55
270
2-24-59 - bought 100 100
Balance
155
270
3-2-59 - sold 100 [100]
Balance
55
270
4-30-59 - 3-1 split - Balance
165
810
11-25-59 - 2% stock dividend 3
16
Balance
168
826
12-9-59 - sold 100 [100]
Balance
68
826
11-30-60 - 2% stock dividend 1
16
Balance
69
842
Sales 1959 and 1960 [8]
Balance at date of Saul's death (1-17-61)
61
842
*254 Our determination of the amount of stock received as stock dividends is shown as whole shares, in the absence of evidence to the contrary. Our determination that three shares of stock were sold in 1957 was based on Dorothy Appel's testimony in regard to her research into Saul's records, which testimony was received in evidence without objection. The 200-share sale shown on February 4, 1958, and the 100-share sale shown on March 2, 1959, were determined by us from Saul's 1958 and 1959 income tax returns, respectively. Our determination that 100 shares were purchased on February 24, 1959, and 100 shares sold in December 9, 1959, was made from our examination of Saul's 1959 return. On that return Saul showed 100 shares as purchased on December 9, 1959, and sold in February of the same year. Since such a transaction is not possible, both petitioner and respondent agree that there is an error 288 in this return. However, they disagree as to the nature of the actual transaction. We find that Saul simply reversed the actual transaction on his return, i.e., he showed a sale in February and a purchase in December when he meant to show the purchase in February and the sale in December. *255 Though respondent would have us find that the sale was made in February 1959 and the purchase the previous December, the preponderance of the evidence supports the above finding. We have found that Saul sold 100 shares of his Thiokol stock on March 2, 1959. As the above table shows, if he had previously sold 100 shares in February of that year, he would not have had sufficient shares of his own to be sold. Yet he reported all shares sold as his own. In addition, if he had purchased 100 shares in December 1958, then sold 100 shares in February and 100 shares again in March 1959, there would have been a total of only about 700 shares of Thiokol in his possession at the time of his death, even though there were 903 shares in his possesstion at that time. As the table shows, our finding of a purchase of 100 shares in February and sale of 100 shares in December 1959, results, along with the other evidence, in a total of 903 Thiokol shares of Saul's death, the number actually on hand. Finally, we note that the reversal of the purchase and sale dates was not confined to Thiokol alone. On the same schedule as the Thiokol transaction, Ampex stock is shown as purchased on December 2, 1959, and *256 sold in November of the same year, another impossible event as reported unless there was a short sale, of which there is no indication. It should be noted that the above table shows a total of 911 shares, at 11-30-60, while the estate had only 903 shares at the date of Saul's death in January 1961. There is evidence which indicates, and we have found, that the difference of eight shares represents the sale of small numbers of Thiokol shares in 1959 and 1960 by Saul. On Saul's 1959 income tax return he shows dividend income of $186.34 from Thiokol Chemical. However, the parties agree that no cash dividends were paid by Thiokol in that year. We have, therefore, determined that the amount represents the sale of some of the eight Thiokol shares in that year. Dorothy Appel testified (without objection being made) that her examination of Saul's records revealed that in 1960 some scrip in the company was sold by Saul for $266.64. We have found that this sale was a sale of the rest of the eight shares, and because of Albert's testimony that no sales of his stock were authorized, and because Saul included these sales in his records and showed at least a part of them on his 1959 return, we *257 have allocated the sales of these eight shares against Saul's portion of the Thiokol stock. Thus the table indicates and we have found that of the 903 shares of Thiokol in Saul's name, Albert owned 842. Cf. Estate of Albert Rand, 28 T.C. 1002 (1957); John J. O'Neill, Jr. et al., Executors, 4 B.T.A. 78 (1926). Petitioners contend that though they had originally valued the claim against S. J. Cassell as being worth $6,250 at Saul's death, the claim was in fact worthless at that time. The evidence presented and petitioner's admissions in regard to this claim, however, do not establish it as worthless at the date of Saul's death. The petitioners admit that Saul was in the process of attempting to collect from Cassell at the time of his death. This fact alone would tend to show that Saul felt that his claim was viable at that time. The action of the attorney, Dorothy Appel, of hiring attorneys in Colorado and retaining them until two judgments were entered against Cassell indicates that the estate felt the probability of collection justified the expense. It is also significant that attempts to collect on the debt were abandoned only after Cassell could *258 not be located; not because Cassell was found to be without funds. Finally, the fact that the claim was valued on the estate tax return at $6,250, while judgments totaling $9,122.04 were eventually obtained, indicates that petitioner believed that the claim had value, but might not be collectible in full, at the time the original estate tax return was filed. We reject petitioner's argument that the claims had been valued on the original estate tax return at their principal amount and that the additional amounts of the judgments represented attorney's fees and some interest charges. The petition filed in this case states that the judgments were in the "principal" amounts of $2,375 and $6,747.04, respectively. That petition was prepared 289 by Dorothy Appel, who had pursued the claim for the estate, and who was obviously aware of the situation. We doubt that she would have used the term "principal" if the judgments were for items other than the principal amounts. In light of these facts, we hold that petitioner has failed to show that the value of the claim against Cassell at the time of Saul's death was less than the $6,250 amount shown on the original return and determined *259 by respondent. Cf. United States Trust Co. of New York, Executor, 14 B.T.A. 312 (1928); Estate of Henry Monroe Springer, 45 B.T.A. 561, 573 (1941). The facts concerning the claim against Albert Simonson differ substantially from the one previously discussed. It appears that when the original estate tax return was filed, petitioner and the attorney for the estate, Dorothy Appel, had concluded that a claim existed against Simonson but had no information as to any possible defenses to the claim, the financial condition of the debtor, or the difficulty of collection. After the original return was filed showing the value of the claim to be its face value of $1,000, they learned that a defense of accord and satisfaction had been raised by Simonson. In addition, they learned Simonson was probably judgment proof. The case was not pursued to judgment, but was immediately dropped, no amount ever being collected. Though these facts do not conclusively show that the claim was worthless at Saul's death, they are sufficient for us to find that at his death it had no value to the estate. In Mullikin v. Magruder, 55 F. Supp. 895 (D. Md. 1944), affd. *260 149 F. 2d 593, the question before the court was the value of a claim which an estate had against a named individual. As in this case, the claim had never been collected, and was not being pursued, there being a defense raised of accord and satisfaction. Though the court did not find that the evidence presented at trial established that a valid defense to the claim existed, it still found the claim to have no value, stating (p. 903): In view of this rather unsatisfactory evidence, I was inclined at the trial to think that probably the taxpayers had not met the burden of proof to show that the notes were worthless. They had been valued by the Commissioner at their principal sum. But on further consideration, I have reached a different conclusion. It has frequently been explained that taxation is a highly practical matter. It is, I think, sufficiently clear from this evidence that these notes were practically of no value to the estate. Nothing has been realized on them. * * * Being also of the opinion that taxation is a highly practical matter, we find that on the basis of the evidence presented, the claim against Albert Simonson had no value at the time of Saul's death. Cf. G.H. Hill et al., Administrators, 8 B.T.A. 1277 (1927). *261 Decision will be entered under Rule 50. Footnotes
1. All references to the Internal Revenue Code refer to the Internal Revenue Code of 1954. SEC. 2031. DEFINITION OF GROSS ESTATE. (a) General. - The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States. SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST. The value of the gross estate shall include the value of all property (except real property situated outside of the United States) to the extent of the interest therein of the decedent at the time of his death.↩
2. It is somewhat surprising that respondent should ask us to take into consideration the burden of proof required in a state court to show ownership of property in light of the fact that the presumption of correctness which attaches to his determination in many cases is opposed to the presumption in a state court proceeding. If respondent were asserting that Albert did own the stock in the present case, he certainly would not want us to consider the burden which petitioner would have in a state court to show ownership.↩